In the Matter of the People's Rapid Transit Company, Appellant, *v.* Bowie Dash, Respondent.

The provision of the act of 1860 relative to railroads in the city of New York (§ 1, chap. 10, Laws of 1860), prohibiting the building of any rail road "in, upon or along any or either of the streets or avenues" of said city of New York, "except under the authority and subject to the regulations and restrictions which the legislature may hereafter grant, and provide," applies as well to a railroad crossing or intersecting a street as to one running along it. A railroad crossing a street, either at grade or under or above the surface, is at the point of crossing both "in" and "upon" it, within the meaning of said provision. (Earl, J., dissenting.)

The provision of the General Railroad Act (§ 28, chap. 140, Laws of 1850 as amended by chap. 133, Laws of 1880 and chap. 724, Laws of 1887), authorizing railroad corporations, organized under it, to construct their roads across streets and highways, does not grant the authority made requisite by said act of 1860.

In proceedings to acquire land in the city of New York for the purposes of a railroad, it appeared that the petitioner was organized under the Gen eral Railroad Act; that its declared purpose was to build and operate a railroad in New York city upon which "express trains of the largest passenger capacity may be run at an average speed of fifty miles an hour." The idea of the structure, as stated in the moving papers, "is a two-story viaduct, the first flat having * * * an elevation of about sixty feet above street level * * * to be made of brick arches." The upper story or flat having an elevation of seventy-five feet. The route is laid through blocks from Spuyten Duyvel creek to the Battery, crossing the intersecting streets by steel bridges. *Held* (Earl, J., dissenting), that the General Railroad Act conferred no right upon a company organized under it to build such a structure.

*In re W. S. A. & P. R. R. Co.* (115 N. Y. 442), distinguished.

*It seems* the purpose of said act was to authorize the organization of rail-road companies for building and operating railroads having some kind of resemblance to those structures which had already been built, and where the conditions under which the roads should be thereafter constructed and operated would somewhat resemble those already in operation.

An act of the legislature, passed for a general purpose, should not be construed as giving a right to accomplish that purpose by a method or plan which was clearly not within the contemplation of the legislature and unknown to it when the act was passed, and when from the nature of the case and the surrounding facts it is apparent that such method or plan, if known at that time, would not have been permitted, without the insertion in the act of other and additional provisions rendered appropriate and necessary in view thereof.

(Argued June 17, 1890; decided December 16, 1890.)

Appeal from order of the General Term of the Supreme Court in the first judicial department, made June 7, 1890, which affirmed an order of Special Term denying an application to condemn lands for railroad purposes.

This was a proceeding under the General Railroad Act (Chap. 140, Laws of 1850), and the acts amendatory thereof, by the People's Rapid Transit Company, a corporation organized under said act, to acquire the land of Bowie Dash, in the city of New York, for the purposes of its railroad.

The facts material to the questions discussed are stated in the opinion.

*Albert Stickney* for appellant. The language of an act is, as a rule, to be interpreted according to its ordinary natural meaning; especially if that meaning be also the one which the legislature itself has continually given to the same words. (*In re O'Neil*, 91 N. Y. 516, 520; *Ogden* v. *Saunders*, 12 Wheat. 332; Story on Const. Lim. § 449.) All our railroad acts are to be taken together, and construed as one body of legislation, on one subject. (Kent's Comm. 463; *W. W. T. Co.* v. *People*, 9 Barb. 161, 169; *U. Society* v. *E. Bank*, 7 Conn. 469.) The act of 1850, by its express terms, allowing the construction of a railroad, of any kind, across, along, or upon any street, or highway, in any city, in the entire state,

with that city's consent, is as broad and comprehensive as it could be made. It comprehends every kind of railroad, every city and every public highway. (Laws of 1850, chap. 140, §§ 24, 28 ; Laws of 1838, chap. 160 ; Laws of 1871, chap. 609.) Chapter 10 of the Laws of 1860, did not affect the right to build the proposed road. (Laws of 1831, chap 263 ; Laws of 1832, chap. 93 ; Laws of 1835, chap. 300 ; Laws of 1846, chap. 216 ; Laws of 1848, chap. 140 ; Laws of 1853, chap. 62 ; Laws of 1854, chap. 140 ; *Wakefield* v. *Fargo*, 90 N. Y. 213 ; *People* v. *U. Ins. Co.*, 15 Johns. 358, 379 ; Laws of 1840, chap. 140 ; Laws of 1850, chap. 140 ; Laws of 1860, chap. 145 ; Laws of 1864, chap. 582 ; Laws of 1871, chap. 609 ; Laws of 1872, chap. 825 ; Laws of 1875, chap. 606 ; Laws of 1880, chaps. 133, 417 ; Laws of 1882, chap. 140 ; Laws of 1884, chap. 252 ; Laws of 1886, chaps. 65, 642 ; Laws of 1887, chap. 724 ; *People* v. *O'Brien*, 111 N. Y. 30, 31.) Assuming that the act of 1860 was intended to prohibit the construction of a railroad, such as is here proposed, except under subsequent legislative authority, such authority must be deemed to have been given in Laws of 1880, chapter 133, or in Laws of 1887, chapter 724. (*Harrington* v. *Trustees, etc.*, 10 Wend. 547 ; *Dexter* v. *Allen*, 16 Barb. 15 ; *Lyddy* v. *Long Island City*, 104 N. Y. 218 ; *In re Miller*, 110 id. 216 ; *Mark* v. *State*, 97 id. 572 ; Laws of 1875, chap. 606, § 40 ; *Ely* v. *Holton*, 15 N. Y. 595.) The rights of the petitioner under the General Railroad Act are not restricted by subsequent legislation. (*People* v. *B., etc., Co.*, 89 N. Y. 75 ; Laws of 1884, chaps. 252, 447 ; Laws of 1886, chap. 65 ; Laws of 1888, chap. 514.) The absence of the city's consent cannot be raised by the individual owners of the real estate sought to be condemned in this proceeding. (*In re N. Y. C. & H. R. R. R. Co.*, 77 N. Y. 248.) The alleged intention to use any portion of lands hereafter acquired for purposes not in themselves exclusively railroad purposes cannot be raised on this record by this respondent. (*N. Y. C. & H. R. R. R. Co.* v. *M. G. L. Co.*, 63 N. Y. 326 ; *In re N. Y. C. & H. R. R. R. Co.*, 77 id. 248.)

*George A. Strong* for respondent. The General Railroad Act of 1850 is entirely insufficient to justify granting the prayer of the petition. (*In re W. S. A. & P. R. R. Co.*, 115 N. Y. 445; *People* v. *Newton*, 112 id. 401; *In re N. Y. D. R. Co.*, 107 id. 54; *N. Y. C. Co.* v. *Mayor, etc.*, 104 id. 14; Laws of 1884, chap. 252; *In re N. Y. E. R. R. Co.*, 70 N. Y. 327; *In re M. T. Co.*, 111 id. 597.) The act of 1860 is fatal to this application. (115 N. Y. 445.) The only existing authority for the construction of elevated roads in the city of New York is found in the provisions of chapter 606 of the Laws of 1875. (*In re U. E. R. R. Co.*, 112 N. Y. 69; *Heckman* v. *Pinkney*, 81 id. 215; *Poffinger* v. *Youtte*, 12 id. 42.) The present application is barred by the statute. (Laws of 1886, chaps. 65, 642.) The argument of the petitioner with reference to the crossing of streets is untenable. (Laws of 1854, chap. 282, § 7; Laws of 1888, chap. 514, § 3; *Astor* v. *A. R. R. Co.*, 113 N. Y. 109.)

Peckham, J. There are two grounds for denying this application.

*First.* It seems to me plain that the act of 1860 (Chap. 10), interposes an insurmountable objection to the granting of it. It is stated in behalf of the petitioner that there is no intention of building the road through the length of any street, but only across such streets as it will be necessary to cross in its proposed route through the city, from its northern boundary to the City Hall park. The act of 1860 prohibits the building of any railroad "in, upon or along any or either of the streets or avenues of the city of New York  *  *  *  except under the authority and subject to the regulations and restrictions which the legislature may hereafter grant and provide." It is contended that this act, properly construed, only prohibits the building of a railroad through the length, or a portion of the length of a street, and does not reach the case of a railroad which merely crosses the streets of that city. I cannot agree to any such narrowing of what seems to me the plain meaning of the language used in the act. If the road were built through

the length of a street, its location might be fairly described by the use of either one of the three words contained in the statute, "in, upon or along" such street. But to describe a road which simply crossed ·a street as being built "along" such street, would be using language neither appropriate nor exact. To say of such a road that it would be "in" or "upon" that street at the point where the road crossed it would be both appropriate and exact. There is a difference in the meaning of these three words as used in the statute, and some effect should be given to such difference. If their meaning be construed to simply prohibit a railroad along the length of the street, no effect whatever is given to this difference. The words used are certainly apt to describe a railroad which crosses a street. Such a railroad is plainly, for that distance, both "in" and "upon" the street which it crosses. If not "in or upon" it at that point, where is it? No description of its whereabouts at that particular point is better than to say it is "in or upon" the street which it crosses. It is sufficient, and it is true. It is not necessary that the railroad should pass along the surface of the street in order to be in or upon it. (*Matter of N. Y. District R. Co.*, 107 N. Y. 42.) Finch, J., in the above case (page 52), in alluding to the injury which street railroads might work to the public rights, and to the necessity of guarding and protecting such rights, said : "But street railways may occupy every place in a city and iron the whole surface, or spin their webs in the air over every avenue, or undermine the entire system of city streets." The proposed railroad in that case was underground. There is no doubt that a railway under or elevated above the surface of a street is still a street railway in that street. And when the road crosses the street, either under or above the surface, it is still "in or upon" such street at the point of crossing.

The language of the statute seems so plain and extensive as to furnish a full and conclusive answer to the application of the petitioner. But the researches of counsel have brought to light what is thought to be a legislative interpretation of the meaning oɪ this language, and it is insisted that whenever the

legislature has meant to include the crossing of a street as within its permission or prohibition, it has used such a word as " across," " cross " or " intersect." A careful examination of those statutes reveals, as it seems to me, the fact that those words were generally used with reference to the distinction which the context made between laying a railroad along a highway or canal and across it. No one supposes that there is no difference between a permission to build a road along a street and a permission to cross it. But I think that in merely crossing it the railroad, at the place of crossing, is, " in or upon " the street which it crosses, just as much as it is in or upon the street along whose length it is laid.

And again, it is well known that some times more words are used in a statute than are actually necessary to express the meaning of its framers. The fact that the word " across " or " intersect " has been frequently used in former statutes where they intended to permit or prohibit the crossing of a street is not of any great importance in the construction of another statute in which such word is absent, provided the language actually used is sufficient and appropriate to express the idea that the crossing is permitted or prohibited. If the language be broad enough, and there be no other ground for narrowing its natural meaning, it should not be narrowed because in some other statutes additional words have been used to express the same idea.

The language of the act of 1860 is as apt and appropriate for the purpose of prohibiting the crossing of a street as it is the traveling through its length, and the abutting owners upon the streets which are crossed would be entitled to receive as much protection, by reason of the act, as their brethren dwelling in the street along the length of which the track might otherwise run. And certainly they are as much entitled to it. Although not so numerous, yet the abutting owners of property on the various streets crossed by a railroad running from Spuyten Duyvel to the city hall in the city of New York would make no contemptible showing in numbers, while the value of the property to be necessarily and immediately affected by the

building of the road, it is safe to say would run up into millions of dollars.

No reason can, as it seems to me, be suggested for attempting to narrow by construction and explanation the otherwise plain meaning of this statute.

The railroad contemplated is a vast undertaking. Competent engineers estimate its probable cost, including right of way from Spuyten Duyvel to the park at the city hall (a distance of about fifteen miles), at $86,000,000. It is to pass through great numbers of solid blocks of dwelling-houses and stores, many of them in the heart of the city. A general statute under which a corporation could be formed for building this kind of a railroad would seem to be the most efficient way to secure and conserve all rights. The work of demolition and construction under such peculiar circumstances, and upon so vast and important a scale, should be the subject of great deliberation on the part of the public authorities, so as to furnish the utmost protection and secure the least possible inconvenience to the public and the owners of property adjacent to the contemplated work. The character of such a work and the manner of its execution should be provided for and particularly described. The resposibility of the company to the city or the state for the violation of any of its duties in the course of the construction of the road, should be clearly defined and ample guarantees exacted for the meeting of such responsibilities and for the fulfillment of such duties by the company. It might be that provision should also be made for the payment to the city of a certain proportion of the profits above an amount to be stated. It may be said that the city can provide for all these matters before giving consent to cross the streets. This may be true. Whether such security be sufficient or not is not for this court to say. It is, however, much better that the conditions upon which the work was to proceed should be inserted in a general statute in advance of the organization of a company for the purpose of doing the work as directed by it, rather than that they should be imposed after the company was organized and had done more or less

of the work of construction. It would also prevent the use of any influence to make the conditions of consent, on the part of the city, as purely perfunctory as possible. The conditions to be performed by the company in the case of a general statute would be known in advance, and would be unalterable by the city, and all intending investors in the project would have full knowledge of the same in advance of a subscription.

Matters of this nature have been alluded to for the purpose of showing the very great importance of this work, and to give a reason why the meaning of the language of the act should not be unnecessarily narrowed. If the statute of 1860 furnish an answer to this application, the whole subject can be fully and intelligently discussed, and a general act having all proper safeguards may be passed which will intrust any city through which a road of the kind herein contemplated is to run with such powers in the matter as ought to be given to a municipality when an undertaking of this magnitude and importance is to be carried on, and where the citizens thereof would be so vitally interested in the work and in the manner of its execution.

The amendments to section 28 of the General Railroad Act of 1850, as contained in chapter 133 of the Laws of 1880 and chapter 724 of the Laws of 1887, do not grant the authority made requisite by the act of 1860, and were never intended for any such purpose.

I think the order should be affirmed because the act of 1860 prohibits the building of such a road.

*Second.* I think there is also another equally fatal objection to this application.

It is my belief that the General Railroad Act of 1850 confers no right upon a company incorporated under it to build any such structure as the petitioners have here in mind.

We have lately held that the act permits the organization of horse railroad companies under its provisions. (*Matter of the Application of Washington St., etc., R. R. Co.,* 115 N. Y. 442.)

Permission to build and operate railroads to transport property and persons upon the same by animal power, as well as

by steam, or by a combination thereof, had been granted by the legislature many years prior to the passage of the act of 1850, and when such last-named act was passed the method of propulsion by animal power was familiar to all.

The language of the act in subdivision 7 of section 28 specially included the right of corporations formed under it to transport persons and property by the power or force of animals as well as steam. Horse railways were organized under the act almost immediately after its passage and continuously without any question of right for many years. The contemporary and practical construction given to the act by incorporators under it, by the public officials and by the public itself was in favor of its application to horse railroads. This court in the case above cited held under these circumstances that it included corporations of that kind.

But there is nothing in that case that determines the question now before us. The distance is a long one between a decision that horse railroad companies can be legally organized and can operate their road under the act of 1850, and one that should hold it proper to organize under that act, and build and operate such a road as these petitioners claim the right to build and operate. They seek to build and operate a road in New York city, upon which as they say " express trains of the largest passenger capacity may be run at an average speed of fifty miles an hour." The road as the petitioners also state, is to cross all the streets within the city at an elevation which will not limit, restrict or in anywise interfere with their present or prospective public use. This is to be accomplished by elevating the tracks above the ground, and passing through the solid blocks of buildings in the city which occupy the proposed site of the road. To do this the property so situated must be taken and the buildings destroyed. As contained in the moving papers it is said: " The idea of construction may be described as a two-story viaduct, the first flat having a width of fifty feet with an elevation of about sixty feet above street level. The second story with the same *axis* or centre line as the one on which it rests, would be

twenty-two feet wide on top; seventy five feet above the street. The lower viaduct will have a track on each side or edge. The upper one two tracks side by side. These structures are to be mainly of brick arches, both in longitudinal and cross sections, the lower one being, as it were, complete in itself before the second tier of arches, forming second story, is raised upon it. This system applies to all the work through the *blocks.* The *streets* will be spanned by steel bridges of the most modern and approved designs * * *. It is contemplated to have thirty-one stations between Spuyten Duyvel creek and the Battery * * *. Passengers to be lifted to and lowered from the stations by elevators, of which there are to be four at each station, two on each side of the crossing street, of capacity to give ample room for all comers and goers."

It is plain that no such vast viaduct as is above described, was ever in the legislative mind when the General Railroad Act was passed. Nothing of this kind was then known. The idea is comparatively new. The engineer (now deceased), who originated it, or first gave it study and attention enough to come to some practical conclusion regarding such an extraordinary project, felt the necessity on account of its novelty and cost, of having other and most prominent, as well as competent professional opinion, as to its feasibility and capacity to perform the service which would be required from a structure like this, prior to placing the plan before the public, or seeking to incorporate a company having for its object the building, equipping and running such a road, which is plainly beyond and outside the purview of the act. It cannot be denied that the act was passed for the purpose of effecting the incorporation of the ordinary steam surface or horse railway, and that under it large numbers of both kinds of roads have been incorporated and now remain corporations. It is true that by its terms it was not to be limited to corporations conveying persons and property by steam or animal power. The words "or by any mechanical power," were added, so that under the act, corporations might be formed to use any mechanical power for the purpose of transporting persons or

property.   Under such a provision, it might well be that a company would have the right to organize for the purpose of using as a means of transporting persons and property, some mechanical power which was not in use, or which was even unknown at the time of the passage of the act.   The language used therein would seem to provide for just such a contingency, and to include it within the power given to a company organized under it.

Nor would we say that a railroad company to be properly organized under the act must be wholly confined to a surface road, and not at all an elevated or underground structure. Our judgment goes upon the special facts of this case.   Here is a scheme which in its construction and equipment for actual operation differs as wide as the poles from the ideas which were in the minds of the legislators of that day, as we are able to gather what those ideas were from the language used and from our knowledge of the times in which the act was passed.   A great viaduct, two stories high, one sixty and the other seventy-five feet above the level of the ground, built on arches and going through miles of solid blocks of buildings in a populous city, never, it is safe to say, entered the mind of a single legislator who voted for this act.   It was beyond the imagination of any.

In carrying out the object of the company, that is, in operating a railroad in the city of New York, it is said that it is necessary to do nothing beyond what is plainly authorized by the act.   This, however, depends upon the sense in which that language is used.   The company proposes to issue stock for the purpose of building a steam railroad.   It may borrow money to complete and operate it.   It may purchase or take lands for its necessary use, and hire labor and purchase materials.   All this may be done under the act of 1850, and the object of the company in obtaining and operating a railroad may in that way be attained.   This, however, is but a false view of the situation.   The question is whether the method of obtaining the completed thing, and the thing itself when completed, are really within the authority of the act.   Is this viaduct, fifteen miles long, a means or method of obtaining the

railroad as a completed thing, such as is contemplated or in any fair way authorized by the act? Or is it a structure clearly beyond the scope and purview of the act, and one which would not have been authorized by it without other provisions relating to the building and operation of a road under such different circumstances from the ordinary surface road? The object and purpose of the General Railroad Act were, as it seems to me, to authorize the organization of railroad companies for building, equipping and operating railroads having some kind of resemblance to those structures which had already been built, and where the conditions under which the roads should be thereafter constructed and operated, would somewhat resemble those already in operation. I do not think the petitioners come within the most liberal construction to be given this act. Their proposed road is shown to be radically different in construction, and in almost every detail from any which has ever been erected in this quarter of the world, or until comparatively recently, within the world itself. Its sole resemblance to any railroad ever erected in this country is that the cars are to be run on rails and are to be propelled by steam.

The manner in which the company propose to build and operate this road, I have already stated. There can be no doubt that it is not only an extraordinary but a novel method of building an entire railroad. A viaduct fifteen miles long through the entire length of a city is not a bridge in any sense of the word. Nothing in the act of 1850 fairly describes or authorizes it. In so stating, I do not mean to say that the provisions of a statute can never be construed to include cases or subjects not in existence or known to the framers of the act when it was passed. I am far from holding any such principle. But I think that an act of the legislature, passed for a general purpose, should not be construed as giving a right to accomplish that purpose by a method or plan which was clearly not within the contemplation of the legislature, and which was unknown to it when the act was passed, and when, from the nature of the case and the surrounding facts, it is apparent that such method or plan, if known at that time, would not

have been permitted without the insertion in the act of other and additional provisions rendered appropriate and necessary in view thereof.

It is impossible to believe that the legislature which passed this act, if it had had in mind the building of such a structure through the streets or blocks of a populous city as a method of constructing a railroad, would have permitted it without placing in the act other and greater safeguards to the public interests and the rights of owners of adjacent property than it now contains.

The proposed structure is at least as great a departure from the kind of railroad contemplated in the act of 1850 as are the elevated roads in New York city, and yet, if the appellants be right in their contention that their proposed railroad could be built under the authority of the General Railroad Act, it was wholly unnecessary to have passed the so-called Rapid Transit Act, under which the elevated railroads in New York were organized. The parties had but to organize under the General Railroad Act, and then proceed under its authority to build their roads. I think, however, it was the general belief that the act in question would not cover or apply to the building of what are known as elevated railroads in cities, and that in order to provide for the organization of companies for that purpose a general act was necessary granting power to do such work.

The same views lead to the necessity of an act of the legislature, general in its nature to be sure, but providing therein for some such kind of structure as is herein contemplated.

For these reasons I think the order of the court below refusing the application of the petitioner was correct, and it should be affirmed, with costs.

All concur, except Earl, J., dissenting; Andrews, J., concurs on the second ground of the opinion, and also on the ground that the obtaining of the consent of a municipality to the construction of a railroad is a condition precedent to the exercise by the company of the power of eminent domain in the taking of private property therefor.

Order affirmed.