M. ANNA STANLEY, as Executrix, etc., of WILLIAM FOSTER, Deceased, Plaintiff, *v.* THE JAY STREET CONNECTING RAILROAD, Defendant.

(Supreme Court, Kings Special Term for Trials, July, 1917.)

Injunctions — unlawful use of public highway, restrained by — city of New York — railroads — abutting owners.

> Where no attempt has been made to comply with the law regarding railroads in the streets of the city of New York, the operation of a freight railroad in the middle of one of said streets, with spurs running right and left across the sidewalks on either side into private establishments, over which freight trains are to be operated and freight cars are to be delivered and received, is an unlawful use of the public highway which will be restrained by injunction at the suit of an abutting owner.

SUIT for injunction to restrain operation of defendant's railroad in Plymouth and Bridge Streets, New York city, borough of Brooklyn.

William Wills (James F. Quigley, of counsel), for plaintiff.

Cullen & Dykman (S. B. Olney, of counsel), for defendant.

KELLY, J.   This suit in equity was commenced by William Foster, the plaintiff's testator, who died pending the final submission of the case for decision.   The suit was revived in the name of the plaintiff.

The complaint alleges that Foster is the owner in fee and in possession of premises at the southwest corner of Bridge and Plymouth streets in the borough of Brooklyn, city of New York.   The property consists of a five-story factory building, eighty-three feet on Plymouth street and fifty feet on Bridge street.   The complaint alleges ownership in the plaintiff since the year 1891 of the property mentioned, with " certain rights and easements to the streets lying immediately in front of and adjoining said premises, to the centre lines thereof, respectively."

It is charged that the defendant, without the consent of the plaintiff, and without any other lawful right or authority, and without making any compensation to the plaintiff, did on or about October, 1916, construct a railroad in Plymouth and Bridge streets, directly in front of plaintiff's premises and across the sidewalk in front of plaintiff's property, for the purpose of operating such railroad as a freight carrying road, and it is alleged that the defendant is operating freight cars thereon between the dock or terminal at the foot of Jay street, Brooklyn, and certain private

premises opposite the plaintiff's property on Bridge street. Plaintiff complains that the operation of defendant's railroad is illegal and that it interferes with access from and to plaintiff's property, and with the use of the streets named. Plaintiff asks an injunction restraining the operation of the railroad and that defendant be compelled to remove its tracks and appurtenances from the street and sidewalk, and restore the original condition of the highway.

The defendant, answering, alleges that it is a domestic railroad corporation, formed by the consolidation of two former domestic railroad corporations, and avers that its railroad is constructed and is operated in accordance with its certificate of incorporation, and the consent of the city of New York duly had and obtained and with the permission and approval of the public service commission. It alleges that it is lawfully in the highway and that it has the right to operate its railroad in the street and across the sidewalk in front of plaintiff's premises, despite his objections.

There was a full discussion of the legal questions involved upon the trial, and they are fully set forth in the stenographer's minutes. After the conclusion of the trial, I ordered a reargument on the legal question whether the defendant company has any right to operate this railroad in the public streets, and this reargument is also fully reported. I then stated my views that the statutes do not authorize the operation of defendant's railroad in the highway, and gave the reasons for my conclusions. Perhaps it is unnecessary to add to what is there said.

At the outset, I find that the plaintiff does not own the fee of either Plymouth or Bridge streets. His complaint must stand or fall on his rights to the easements of light, air and access, as an abutting owner, under the doctrine established in the *Story* and *Lahr*

elevated railroad cases. I think there can be no doubt that the defendant railroad company seriously interferes with these rights of the plaintiff as an abutting owner. The defendant's freight railroad operates in Plymouth street, for the full length of plaintiff's property and cuts diagonally across the sidewalk on the corner of Plymouth and Bridge streets so that the freight cars in operation come close to the plaintiff's building. Cars and trains of cars operate back and forth over these tracks and necessarily there is at times a blocking of the street and sidewalk in front of plaintiff's property, and some interference with the light. This use of the sidewalk on the southwest corner of Plymouth and Bridge streets is to enable defendant to operate its freight railroad and cars into the private property of Kirkman & Sons' soap factory, across Bridge street from the plaintiff's property. The plaintiff does not use defendant's railroad, and has no connection with it.

I may also say that on the evidence I find that the defendant has obtained the constitutional consents of the abutting property owners on Plymouth and Bridge streets to the operation of the railroad in those streets. The plaintiff has not consented, and the consents obtained by the defendant are from large mercantile and manufacturing concerns which own a great deal of real estate in the neighborhood, with a frontage on the highways used, which enables them to supply the consents of property owners in the requisite amount. Most, if not all, of these mercantile and manufacturing concerns are interested in, and have connections with, defendant's railroad in the streets mentioned and in other public highways in the vicinity by means of spur tracks, or turnouts, running from the railroad in the middle of the street, into their various establishments on either side. The defendant oper-

ates its trains of freight cars by means of an electric locomotive, along the streets and in and out of these various factories and buildings. The layout of defendants's railroad, as at first contemplated, is found in the plan at the end of defendant's exhibit " C," the contract between the city and the railroad company, dated June 29, 1911, under which the board of estimate assumes to grant to defendant the privilege of operating its railroad. It will be observed that, as originally contemplated, the railroad simply *crossed* Jay street, John street, Pearl street and Plymouth street, to reach certain private concerns and connect them with the main railroad terminal at the foot of Jay street on the East river.

But whatever may have been the legal aspect of the contract, exhibit " C," the scope of the defendant's operations was most decidedly extended by the amended contract with the city, acting through the board of estimate, on November 15, 1915, under which defendant is now operating (exhibit F). A reference to the maps or plan at the end of this contract discloses, what is to me, a most remarkable enterprise and a use of the public streets in the city of New York never attempted in any previous undertaking that I have heard of. It will be found that the defendant's railroad, running out of the railroad yard on the water front, known as the " Jay Street Terminal," runs southerly and westerly across and along John, Plymouth, Water and Front streets, east and west; and Jay, Adams, Washington, Main and Bridge streets, running north and south, connecting the " Jay Street Terminal," which is the defendant's northerly or northeasterly terminus, stated as required by law in its certificate of incorporation, with several so-called westerly termini — several of them — also stated in the certificate of incorporation, as required by law,

32

and each of these so-called termini of defendant's railroad is on private property of a private corporation. For instance, the " railroad " or " branch " or " spur " or whatever it may be which immediately concerns the plaintiff runs south along Jay street from the terminal with " spurs," or " turnouts " running into Arbuckle Brothers' establishments and, turning east into Plymouth street, terminates in the soap factory of Kirkman & Sons, opposite plaintiff's property, with a " spur " or " turnout " running into Masury & Company's paint works and the E. W. Bliss & Co. ammunition factory. And each of the other " branches " has the same general characteristics. Each of these large factories has a private railroad track in the street, connecting it with the Jay street terminal. And as this track runs along the public highway there are various spurs at different points running across the sidewalk into other private mercantile premises. The amended contract with the city obligates the defendant railroad company to give every abutting property owner a private spur for use in receiving and delivering freight.

Now, I have no doubt that the learned counsel for the defendant is sincere in his argument that the defendant is really benefiting the various highways occupied by its railroad. He avers that if it were not for the defendant's railroad these streets would be congested with vehicular traffic, trucks, wagons and the like, and in his claim asserted with much earnestness that this is a legitimate use of the highway — a use not inconsistent with the primary object and use of the public highway.

But I am constrained to differ with the defendant. I do not think the railroad of the defendant corporation is a railroad within the contemplation of the provisions of the Railroad Law, under which it is incor-

porated. I do not think the "termini" of this rail-road in the various private establishments in the locality are "termini" within the contemplation of the legislature when it enacted the Railroad Law. I think this is essentially a private railroad enterprise operated, not for the convenience of the public, but for the convenience of these several enterprises to which the railroad runs. These business concerns certainly have the right to use the streets in common with the public, but it seems to me that when it is proposed to use the public streets for the operation of a freight railroad for their private purposes the plan is entirely foreign to the intention of the legislature in authorizing the incorporation of railroad corporations with the powers and privileges granted to them as public common carriers. If there is any doubt about the private character of the defendant's railroad in the street I cannot see any possible question as to the private character of these various spurs and turnouts, which are maintained and operated for the benefit of the particular establishment into which they run. And without these private spurs, tracks and turnouts, the defendant's railroad simply runs from the terminus in the "Jay Street Terminal" along the highway, into Kirkman & Sons' establishment. It is without a public station or freight yard at which the general public can receive or discharge freight, and, concededly, it never was intended for the use of the general public. It does not stand the test by which a public use of a highway is distinguished from a "private" use. These trains and cars are not "open to the public under proper regulations" nor can they be "used by any and every person without restriction or limitation except compensation to the owner of the vehicle." *People* v. *Kerr*, 27 N. Y. 188. I do not think the city had any power to grant to defendant the right to use these high-

ways in the manner in which they are used. I do not believe that the use made of these highways by defendant, with these spurs or connections running across the sidewalks and the operation of freight cars in and out of these private establishments and over the streets, is consistent with the public use of the street. If the so-called " obligation " placed on the defendant by the city authorities to grant a railroad connection to every abutting owner who asked for it were enforced, the various streets on which defendant has laid its tracks and the sidewalks on either side would be turned into one great railroad yard. As Judge Cardozo says in the *Steers* case, *infra:* " There would be a net-work of lines which would engross the highway." There could be no other use for them by pedestrians or vehicles. While it is urged that this particlar locality in Brooklyn is largely, if not entirely, a manufacturing center, we must remember that these ancient streets and highways are part of the city streets, belonging to all the people, those living in the immediate locality (and there are many of them) and those living in any part of the city and state. The thousands of employees of these great establishments, when they go to work in the morning or leave work at night, have the right to travel on these highways, to and from their work, a right not derived from their immediate employers, the city, or the defendant. I regard it as a most unusual departure, even in these progressive days, to use a public highway in this manner. Judge O'Brien, writing for the Court of Appeals in *Hatfield* v. *Straus,* 189 N. Y. 208, says: " The railroads may have the power to carry goods, but it by no means follows that the city authorities have the power to furnish railroad facilities to merchants who, instead of using trucks and wagons for the shipment and delivery of goods, find it more convenient to use railroad tracks and railroad

cars. The power of the railroads to carry goods is one thing, but the power of the city authorities to incumber the public streets with railroad spur tracks is quite another and different thing.''

As I suggested at the trial, if this may be done, with these particular streets, the same method may be adopted with Clinton or Washington avenues in Brooklyn or with any of the city thoroughfares which have the good or bad fortune to cross or touch a railroad terminal in any of the boroughs of the city of New York. If it is necessary to use the streets of the city of New York for any such purpose, it seems to me, the proper method is to close the streets by due legal process in which the rights of the city, the abutting property owners and the general public can be ascertained and protected. This method was adopted in 1902-1903 when the Pennsylvania Railroad constructed its terminal in the borough of Manhattan, and when the Sunnyside freight terminal or yard was established in Long Island City. To attempt to use the public streets, as contemplated by the defendant under the contract in evidence, is to my mind entirely unwarranted.

Again, this use of the public streets in New York city, for railroad purposes, under the contract, exhibit F, seems to me to be in contravention of the statute. In 1860 the legislature forbade the construction and operation of railroads in the streets of New York city, save under express regulation to be prescribed by the legislature (Laws of 1860, chap. 10). And after various plans and methods adopted, by means of elevated railroads, rapid transit acts, tunnel railroads and the like, a so-called street surface railroad law was enacted (Laws of 1884, chap. 252, as amended), designed to apply to New York city. Passing for the moment the question whether the use of the surface of the streets of New York city for a freight railroad exclusively

was within the contemplation of the legislature when it enacted the Railroad Law, one of the most recent reforms attempted in controlling the use of the streets for railroad purposes, was the so-called Cantor Act (Laws of 1886, chap. 642, as amd. by Laws of 1892, chaps. 306, 676, Laws of 1893, chap. 434, Laws of 1901, chap. 494, Genl. R. R. Law, § 93) requiring, as a prerequisite to the grant of any franchise or right to operate a railroad in the streets of New York city, that such proposed franchise or right should be advertised and sold at public auction to the highest bidder. There are also further restrictions on such a franchise as to its duration (Greater N. Y. Charter, § 73). Nothing of the kind has been done here. No attempt has been made to comply with the law regarding railroads in the streets of the city of New York.

And it seems to me that the situation suggested by the Appellate Division in this department in *De Grauw* v. *Long Island Electric R. R. Co.,* 43 App. Div. 502; affd., on opinion below, 163 N. Y. 597, is here presented concisely. While in that case, the use of the streets by express cars running on the tracks of a street surface passenger railway was allowed, the possibility of an unlawful extension of the doctrine was clearly in the mind of the court when it said, through Judge Hatch: " In the struggle which is going on for the transportation of persons and property, it must be confessed that street surface railroads are not backward in the assertion of all the rights which the grant of power confers. But the law is, and the courts may be relied upon to enforce the law, that the right of use of the street by the public is first and primary; the right of use by the street surface railroad is secondary and subordinate. It has the paramount right to the use of its tracks, but not the exclusive use, and when the right of the public

or an individual member of it requires the use of the street for a proper purpose, the right of the railroad company must yield thereto, even though the effect be, for the time, to stop the operation of its cars thereon. (*Black* v. *Staten Island El. R. R. Co.*, 40 App. Div. 238.) We have, at all times, been mindful of these conditions, and when upholding the rights of the railroad in a given case, we have been careful to place a limitation thereon, and have uniformly asserted that whatever be the character of operation by the railroad, and whatever use it sought to make of the street, such use is subject to the authority of the public therein, and the public authority may, whenever necessary for the preservation of the street for street purposes, regulate and restrain the use thereof by the railroad.''

The case at bar seems to call for interference by the courts at the suit of an abutting property owner. The doctrine of *Fanning* v. *Osborne & Co.*, 102 N. Y. 441; *Brooklyn Heights R. R. Co.* v. *Steers*, 213 id. 76; *Hatfield* v. *Straus*, 189 id. 208, seems opposed to the defendant's plan of operation. Indeed the criticisms of Mr. Justice Clarke in the Appellate Division, in his opinion (117 App. Div. 671) are exactly applicable to the enterprise of the defendant. It is impossible to imagine a public highway in the city of New York, for the use of pedestrians and vehicular traffic, with a freight railroad in the middle of the street, and with spurs running right and left across the sidewalks on either side, into private establishments, over which freight trains are to be operated and freight cars to be delivered and received. I cannot subscribe to the legality of such attempted use of the public highways in the city of New York.

The case of *Clarke* v. *Blackmar*, 47 N. Y. 150, cited by defendant's counsel in his brief, has no more application to the case at bar than it had to the *Steers* case,

*supra.* Whatever may have been the situation in the city of Buffalo, in 1864, or whatever privileges it may have been attempted to reserve to the common council of that city, we have here in the present case the city of New York in 1916–1917, and I can find no provision in the charter of the city of New York, granting any such power or privileges to the board of aldermen or the board of estimate as would warrant the grant made to the defendant in this case. And in the Buffalo case, the grant there made was to cross a public street, not to use a public street as a private right of way.

The sections of the General Railroad Law, on which defendant relies for its corporate existence, the language of the certificate of incorporation describing the railroad and its so-called " terminii " on private property — the absence of all reference to the provisions enacted for the protection of the city streets in article IV of the Railroad Law, seem to warrant the plaintiff's complaint, that it has no right to use the streets and sidewalks in his locality as it is attempting to use them. Judge Peckham writing for the Court of Appeals in *Matter of Washington St. A.* v. *P. R. R. Co.,* 115 N. Y. 442, said: " One or two expressions in opinions written by judges of this court have been cited as evidence that the general railroad act of 1850 had no application to street railroads. The cases from which these extracts have been taken are: *New York Cable Co.* v. *Mayor* (104 N. Y. 1–14); *Matter of New York District R. Co.* (107 id. 42, 53, 54); *People ex rel. Third Ave. R. R. Co.* v. *Newton* (112 N. Y. 396). Each one of the above cases arose in· New York city, and in regard to that city it is admitted that the general railroad act has now no application, for, by chapter 10 of the laws of 1860, it was made unlawful to thereafter lay, construct or operate a railroad in New York city except under

the authority of the legislature to be thereafter granted.''

The defendant, in my opinion, has entirely disregarded this statute of 1860 — it is endeavoring to operate a street surface railroad in the city of New York without reference to the restrictions of the street surface railroad article in the general law, and the entire purpose of its organization and methods '' differs as wide as the poles from ideas which were in the minds of the legislators '' in enacting the provisions of the Railroad Law of the state of New York and the Greater New York charter, governing the use of the public highways by railroads. *Matter of People's Rapid T. Co.* v. *Dash,* 125 N. Y. 103.

I must therefore hold that the defendant's use of Plymouth and Bridge streets is unlawful and give judgment for the plaintiff, with costs.

Ordered accordingly.