## Hagner, Appellant, *v.* Pa. Schuylkill Valley R. R.

|154  475|
|166  443|

*Railroads—Location—Eminent domain.*

The act of location of a railroad is also the act of appropriation. The space covered by the line as located is thereby seized and appropriated to the purposes of the construction and operation of the railroad by virtue of the power of eminent domain, and nothing remains to be done except to compensate the owner: Williamsport R. R. v. Phila. & Erie R. R., 141 Pa. 407.

The act of location of a railroad is the adoption of a line by resolution of the company and not a mere experimental line of an engineer.

*Change of location—Damages.*

A railroad company may, before the construction of its road and before damages are assessed, change the location.

*Railroads—Eminent domain—Dwelling house—Act of Feb. 19, 1849.*

Where the line of a railroad has been surveyed and located so as to cut through a dwelling house in the occupancy of a tenant, the owner of the house cannot, after the survey and location has been approved by the board of directors of the railroad company, prevent the company from taking the house by removing the tenant and occupying the house himself, merely for the purpose of preventing its condemnation under the Act of Feb. 19, 1849, § 10, P. L. 83.

Argued Feb. 1, 1893. Appeal, No. 120, Jan. T., 1893, by plaintiff, King Hagner, guardian of Kate and Annie Higgins, from decree of C. P. Montgomery Co., March T., 1890, No. 12, dismissing a bill in equity. Before Paxson, C. J., Green, Williams, Mitchell and Dean, JJ.

Bill for injunction to restrain condemnation of dwelling.

The case was referred to B. E. Chain, Esq., as master, who recommended that the bill be dismissed. Exceptions were dismissed in the opinion of the court, in part as follows, by Swartz, P. J.:

" The bill was filed to restrain the defendant company from constructing a branch road through a building claimed by the complainants to be a dwelling house in the occupancy of the owner.

" The plaintiff claims that the house became a dwelling house in the occupancy of the owner on Sept. 21, 1889, before the branch road was adopted. The defendant company contends that the branch road, through the house in question, was selected and adopted by the corporation on Sept. 5, 1889. It is also alleged that the house in question never was a dwelling house in the occupancy of the owner."

After reciting the surveys and locations, under the last of which the road was being built, the Court continued :

" If the first location by the company survived the second location, then for the same reason the second must have survived the third, of April 23, 1890. It follows that the com-

pany in its efforts to build a single road had three locations in full force at the same time. This cannot be, when we consider the effect of a location by the company. The adoption of a line by the corporation ' makes what was before experimental and open, a fixed and definite location. It fastens a servitude upon the property affected thereby, and so takes from the owner and appropriates to the use of the corporation. . . . The act of location is at the same time the act of appropriation. The space covered by the line as located is thereby seized and appropriated to the purposes of the construction and operation of the railroad by virtue of the power of eminent domain and nothing remains to be done except to compensate the owner.' Williamsport R. R. v. Philadelphia & Erie R. R., 141 Pa. 407.

" To hold that the three locations may subsist at the same time is to hold that the corporation may impose these servitudes without limit. Such an exercise of the right of eminent domain might lead to great hardship. While the appropriation of the railroad continues, no permanent improvement can be made by the owner, for a subsequent construction of the road may sweep them away without compensation—at least this would follow where such improvements were made with notice of the location: Lafferty v. R. R. Co., 23 W. N. 334. When we speak of location we mean an adoption of a line by resolution of the company, not a mere experimental line of an engineer.

" It may be said that the company having made its location should be held to it. This would impose unnecessary hardship upon the company. The location may have been made in good faith but subsequent investigation or action may show that a construction according to the location is not feasible. Suppose in this case the company had been restrained from crossing the Philadelphia & Reading road under grade because of unnecessary injury to the road so crossed. To hold that in such case the company had exhausted its powers and could not change the location might deprive the public of necessary railroad facilities. And to hold that the company may change its location, but must pay damages for the original location, as if the road had been actually built upon that line, is unjust and might be ruinous to the company.

" We are aware that it has been decided that a railroad com-

pany may not change its location after damages for land taken are assessed: Neal v. Railroad, 31 Pa. 19 ; Beale v. R. R. Co., 86 Pa. 509. But these decisions are based upon the ground that a railroad company has no right to experiment upon the question of damages—it cannot change its location to escape the payment of unsatisfactory damages. But in the case before us, no work was done on the original line at the time the change was made, and no steps were taken to assess damages ; therefore the grounds upon which the foregoing decisions are based do not exist in our case. If changes in location cannot be made when proper railroad construction demands them, the public must suffer as well as the corporation. Mistakes will happen in engineering as well as in other work, and such mistakes may not be discovered until after the location of the road. While the location continues, the owner, by reason of the appropriation of his . land, may sustain some damages. These should be paid ; and, when they are paid, no one is injured by a change of location made in good faith.

" If we are correct in these views, then the defendant company abandoned the location along the river front on Nov. 11, 1889 ; but by resolutions on April 23, 1890, the original line was again adopted. The appropriation of the plaintiff's house .must therefore date from April 23, 1890. At that time the minors by direction of their guardian occupied the house in question.

" Was this a dwelling house in the occupancy of the owner ?

" The learned master has not given us the benefit of his researches and judgment upon this branch of the case, because unnecessary under his finding. Patrick Higgins, at his death, was the owner of eleven houses in Lower Merion fronting on the River road. Nine were located on the west side of the highway and the remaining two were situate on the east side of the road, between said River road and the Schuylkill river. He died intestate and left to survive him two daughters. He died July 27, 1886. The railroad was located through or near the two houses on the river side of the highway. On Sept. 21, 1889, by direction of the guardian, the daughters moved into one of these two houses. At that time Kate was nineteen years old and Annie not quite seventeen. The house was very small, having but a single room on the first floor, one room on the

second floor, with an attic above.   In the lifetime of Patrick Higgins and up to the day the daughters moved in, this house was used as a tenant house.   Andrew Yankowski occupied it up to the day the minors moved in.   The tenant must have had a short notice to quit, for he moved out four or five days after the notice was given.   The minors were in haste to occupy, for the guardian says ' the tenant left on the same day the girls moved in.'   Patrick Higgins up to his death lived with his daughters in one of the nine houses on the west side of the highway.   The household goods were stored in this house after his death, and were removed from the homestead house by the minors or their guardian into the small house on the east side of the highway on the day the minors moved in.

" Up to the summer of 1889 the minors were attending school at the West Chester College.   Their vacation was spent among relatives and it was not until Sept. 21, 1889, that they were ordered to occupy the tenant house.   After they moved into the house the younger daughter still attended school in Philadelphia, going up and down by train.   How the minors lived in this house does not appear very clearly.   About all the evidence we have is that they moved in.   A witness called by plaintiff says he was in the house several times, saw a cook stove there, but never saw any eatables or any cooking done in the house.   The railroad company took actual possession of the premises about July 3, 1890.   The minors then moved out and there is no evidence that they afterwards occupied any of the other houses ; on the contrary, when the testimony was taken, Nov. 17, 1890, they were living with friends in Manayunk.

" On Sept. 6, 1889, the agent of the railroad company had an interview with the guardian and made efforts to purchase for the railroad the two houses and lot on the east side of the highway.   The guardian refused to sell unless the company would buy the entire eleven houses.   This offer was declined, and the negotiation failed.   The guardian says : ' I wanted to sell him the whole of the property, both at the east and west sides of their road.'

" A mere recital of the facts in this case convinces us that the occupancy was but a scheme to defeat the railroad construction on the proposed line.   Why should these college girls be content to occupy this little tenant house, affording but a single room

for kitchen, dining room and parlor? Why not move into the old family home which they had enjoyed with their father? Their furniture was stored in the house and we see no occasion for its removal. It cannot be said that they moved into the tenant house because it stood idle. Why this hurry to get rid of the old tenant? They were spending their summer vacation with friends and relatives, and this intent to engage in housekeeping comes like a flash; the tenant has but four days to remove, and the day of his removal is the day of their occupancy. But a few days before, the guardian was ready to sell all the houses, now he suddenly discovers that he must have this particular house as a dwelling for his wards. The spirit of housekeeping ends as suddenly as it began, for when the company took the house, the minors returned to their former method of living, that is, they went to live with their friends, although their guardian still had nine other tenant houses in the immediate locality belonging to the estate. When the company would not buy all the houses, then the guardian ordered the wards to occupy. Here we have the solution of the unusual conduct of the minors. The guardian manipulated the whole proceeding. He says: 'I directed them to move into the house.' A dwelling house under such circumstances is not in the contemplation of the law a ' dwelling house in the occupancy of the owner.' The legislature means to protect the man who owns his land and occupies it in good faith. Their protection cannot extend to the man who becomes an occupant for the mere purpose of defeating public improvement or for the purpose of extorting excessive compensations. Such an occupancy instead of being honest is fraudulent: Mills on Eminent Domain, § 120.

" We conclude that, as between the plaintiff and defendant corporation, the house in question was not a dwelling house in the occupancy of the owner."

Bill dismissed with costs. Plaintiff appealed.

*Error assigned* was, inter alia, decree, quoting it.

*Charles Hunsicker*, for appellant, cited: Williamsport & North Branch R. R. v. Pa. & E. R. R., 141 Pa. 407; Gilmore v. Pittsburgh, Virginia & Charleston R. R., 104 Pa. 275; Carris v. Com'rs, 2 Hill, 443.

*C. H. Stinson,* for appellee, not heard, cited: Brocket v. Ohio & Pa. R. R., 14 Pa. 241; Morris v. Schallsville R. R. 4 Bush, 448; Carris v. Com'rs, 2 Hill, 443.

PER CURIAM, February, 13, 1893:

The decree is affirmed, and the appeal dismissed at the costs of the appellant.