[No. 9214.    Department One.    February 4, 1911.]

THE STATE OF WASHINGTON, *on the Relation of B. Schade Brewing Company, Plaintiff,* v. THE SUPERIOR COURT FOR SPOKANE COUNTY, *Henry L. Kennan, Judge, et al., Defendants.*[1]

EMINENT DOMAIN—PROPERTY SUBJECT—STREETS—FRANCHISE. A railway company cannot condemn from abutting lot owners the right to maintain tracks in a city street without a valid franchise from the city to the use of the street.

SAME—EXTENT OF POWER—STATUTES—CONSTRUCTION. Rem. & Bal. Code, §§ 8739, 8740, granting to railway corporations the right of eminent domain, do not authorize condemnation of land held in trust for the public as a city street, since the law must be construed to relate to private property only, in the absence of an express or implied authority to take public lands.

SAME—APPLICATION OF STATUTE. Rem. & Bal. Code, §§ 5717, 5718, in the act conferring the right of eminent domain upon corporations organized for the construction of any railway, macadamized road, plank road, clay road, canal, or bridge, and which authorize any company "herein mentioned" to appropriate any part of a public road or street, upon terms to be agreed upon by the county commissioners or city authorities, if the parties can agree on the terms on which the same may be appropriated, used or occupied, and if unable to agree, then such corporation may appropriate so much as may be necessary without any such agreement, do not authorize a railway company to appropriate a part of a city street; but the sections apply only to road and toll companies occupying the street with the public, in view of Id., § 5719, which provides that where such highways are taken by agreement with the local authorities, the corporation may place gates thereon and receive

[1]Reported in 113 Pac. 576.

such tolls as the local authorities consent to, and if appropriated without such agreement, no gates or other obstructions shall be placed on the public roads or tolls charged.

MUNICIPAL CORPORATIONS — STREETS — RAILROADS — OBSTRUCTIONS AND USE—POWER OF CITY—STATUTES—CONSTRUCTION. The right to occupy a public street to the exclusion of the public cannot be granted to a railroad company by a city, under Rem. & Bal. Code, § 7507, providing that the city may authorize the locating and construction of any railroad in any street and prescribe the terms; nor under Id., § 7479 granting practically the same powers to cities of the first class by an act entitled an act granting "additional authority" as to the location of railroads, in, along, over or across any street, which act regulates the granting of franchises for such use of the streets without giving any material additional powers.

SAME—STREETS—FRANCHISES — POWER TO GRANT — VACATION OF STREETS. A franchise to a railroad company to occupy a part of a public street to the exclusion of the public cannot be upheld under the city's power to vacate the street, when it was not exercised in the manner prescribed by Rem. & Bal. Code, §§ 7840-7843, for such vacations.

SAME. A city of the first class is not authorized to grant a franchise to a railroad company to encroach upon or use a material portion of a city street to the exclusion of the public therefrom.

STATUTES—CONSTRUCTION—TITLE OF ACT. An act entitled an act "granting additional power" is not to be construed as granting any additional power where its provisions do not do so.

MUNICIPAL CORPORATIONS — STREETS — FRANCHISES — STATUTORY AUTHORITY. Power to authorize the location of a railroad "in" a street does not imply or mean power to grant an exclusive right to use the street.

SAME. Power to alter streets, change grades, and exercise general control over streets, does not include the power to surrender the use of any part of the surface thereof.

SAME. Power to grant to a railroad company the right to tunnel under, and use land under the surface of the street, does not include the right to grant the exclusive use of a part of a street for the purpose of descending to the grade under the street.

Certiorari to review a judgment of the superior court for Spokane county, Kennan, J., entered October 20, 1910, adjudging a public use and necessity in condemnation proceedings. Reversed.

*Turner & Geraghty* and *Graves, Kizer & Graves,* for plaintiff.

*H. H. Field* and *F. M. Dudley,* for defendants.

PARKER, J.—The relator has brought here by a writ of review, and seeks to have reversed, findings of necessity and an order for trial to assess damages against it, made by the superior court for Spokane county in an eminent domain proceeding instituted in that court, in which proceeding the Chicago, Milwaukee & Puget Sound Railway Company seeks to condemn property rights of the relator as the owner of lots abutting upon Front avenue in the city of Spokane. The facts shown by the record are undisputed, and so far as necessary for us to notice them, they may be briefly summarized as follows: The relator is the owner of lots abutting upon the northerly side of Front avenue, a public street in Spokane, having a frontage on that avenue of approximately three hundred and twenty-five feet. The railway company proposes to construct in that portion of Front avenue upon which the relator's lots abut, and on other portions thereof, a double track railway. It is proposed to construct these tracks in a cut so that they will be from thirteen to twenty-two feet below the level of the surface of the avenue. This cut is to be thirty-two feet wide and its sides supported by walls of masonry which are to extend up to the surface of the street. Along on the top of the walls in front of the relator's property is to be constructed a substantial iron fence, so as to effectually exclude the public from that portion of the avenue occupied by the cut and the track. The cut on that portion of the avenue will not be deep enough to admit of maintaining the street surface over it without interfering with the operation of the railway, as it will be elsewhere along the avenue where the street surface will be maintained. The cut will occupy nearly the entire south half of the avenue, leaving the north half, upon which the relator's property immediately abuts, undisturbed.

Prior to instituting the eminent domain proceedings by the railway company to acquire the right to maintain and inclose this cut as against abutting property, the city of Spokane, by ordinance, granted to the railway company a franchise to occupy Front avenue in the manner we have described. This ordinance contained a proviso that the railway company should not occupy the portion of the avenue here involved until it had fully compensated the owners of property abutting thereon for any damages sustained to such property by reason of the construction of the railway in this manner. To the end that its right to proceed with the construction of its railway under this franchise might be perfected, it instituted condemnation proceedings against the relator. Upon the preliminary hearing, counsel for the relator objected to the court's making any finding of necessity or order for assessing damages, upon the ground, in substance, that the city has no power to grant to the railway company the right to occupy the avenue in front of relator's property in the manner contemplated. This objection was overruled, when finding of necessity and an order directing a trial to assess damages were entered. These are the rulings which are here sought to be reversed.

It is at once apparent that the right of the railway company to condemn the property rights of the relator depend upon the right of the railway company to occupy the avenue in the manner proposed, as against the public. If the railway company has not acquired by lawful grant the right to occupy the avenue in this exclusive manner as against the right of the public to use it as a street, then it follows that the railway company cannot acquire the relator's rights therein as an abutting owner by eminent domain proceedings. Otherwise the railway company could exercise the right of eminent domain to acquire the relator's property rights in the avenue, to the end that a nuisance might be maintained therein by the railway company. This plainly is not the law. *State*

*ex rel. Sylvester v. Superior Court,* 60 Wash. 279, 111 Pac. 19.

We are not here confronted with any question touching the manner of the passage of this franchise ordinance; neither is there any uncertainty as to its terms, which plainly indicate an intention on the part of the legislative power of the city to grant to the railway company the right to occupy substantially one-half of the avenue in front of the relator's property, to the entire exclusion of the public therefrom. The problem for our solution then is, has the state, by legislative enactment, delegated to cities of the first class, to which class Spokane belongs, the power to grant by ordinance such franchise and privilege as this ordinance in terms assumes to grant to the railway company in this avenue. Learned counsel for the railway company have called to our attention two classes of legislative enactments which are relied upon by them in support of their contention that the city possesses ample power to make this grant. First, railway legislation; and second, municipal legislation. The first class has to do with the rights of certain public service corporations to occupy public highways with or without the consent of the local authorities, as is contended by counsel for the railway company; while the second class relates to the granting by cities of the first class of franchises to railway companies to lay their tracks in the streets of such cities. We will notice these in order.

In 1873, the territorial legislature passed an act entitled "An act to provide for the formation of corporations." Laws of 1873, p. 398, 411. This was an original act complete within itself, so we ignore previous acts upon the subject. This act, among other things, provided for the exercise of the right of eminent domain, and the acquiring of rights of way by public service corporations. As to the matters here involved, this act does not appear to have ever been changed or superseded, save by amendments, by reference to its sections as therein numbered, or as those sections and

their amendments have been numbered in the Code of 1881,
Hill's Code, or Ballinger's Code.   Relying upon this fact,
learned counsel for the railway company invoke the provis-
ions of this act and its amendments as a single law upon the
subject, to the end that the several sections of law here re-
lied upon to support the railway company's right to acquire
the use of this avenue in this exclusive manner may be con-
strued accordingly, though they are not found together in
Remington and Ballinger's Code.   The original act was di-
vided into chapters, each having a separate series of num-
bered sections, chapter 3 being the part here involved.
So when we refer to a section number it will mean that num-
bered section of chapter 3 of the act, unless otherwise desig-
nated.   We think the following are all the provisions of
that law which can possibly aid the railway company.

Section 1, as amended, being Rem. & Bal. Code, § 8739,
provides:

"A corporation organized for the construction of any
railway, macadamized road, plank road, clay road, canal or
bridge, shall have a right to enter upon any land, real estate
or premises, or any of the lands granted to the state of
Washington for school, university, or other purposes, be-
tween the termini thereof, for the purpose of examining, lo-
cating and surveying the line of such road or canal, or the
site of such bridge, doing no unnecessary damage thereby."

Section 2, as amended, being Rem. & Bal. Code, § 8740,
provides:

"Every corporation organized for the construction of any
railway, macadamized road, plank road, clay road, canal or
bridge, is hereby authorized and empowered to appropriate,
by condemnation, land and any interest in land or contract
right relating thereto, including any leasehold interest there-
in and any rights-of-way for tunnels beneath the surface of
the land, and any elevated rights-of-way above the surface
thereof, including lands granted to the state for university,
school or other purposes, and also tide and shore lands be-
longing to the state (but not including harbor areas),
which may be necessary for the line of such road, railway or

canal, or site of such bridge. . . . And provided further, that if such corporation locate the bed of such railway or canal upon any part of the track now occupied by any established state or county road, said corporation shall be responsible to the county commissioners of said county or counties in which such state or county road so appropriated is located, for all expense incurred by such county or counties in relocating and opening the part of such road so appropriated."

By the Laws of 1888, p. 64, there was added to this law a section to be known as § 2456¾ of the Code of 1881, which as amended, being Rem. & Bal. Code, § 8737, provides:

"Every corporation formed under the laws of this state for the construction of railroads or canals shall possess the power to construct its railway or canal, as the case may be, across, along or upon any river, stream of water, watercourses, plank road, turnpike or canal, which the route of such railway or canal shall intersect or touch; but such corporation shall restore the river, stream, watercourse, plank road or turnpike thus intersected or touched to its former state as near as may be, and pay any damages caused by such construction. . . ."

Section 3, being Rem. & Bal. Code, § 8738, provides:

"Any corporation may change the grade or location of its road, or canal, not departing from the general route specified in the articles of incorporation, for the purpose of avoiding annoyances to public travel or dangerous or deficient curves or grades, or unsafe or unsubstantial grounds or foundation, or for other like reasonable causes. . . ."

Section 4, being Rem. & Bal. Code, § 5717, provides:

"When it shall be necessary or convenient in the location of any road herein mentioned to appropriate any part of any public road, street, or alley, or public grounds, the county court [commissioners] of the county wherein such road, street, alley or public grounds may be, unless the same be within the corporate limits of a municipal corporation, is authorized to agree with the corporation constructing the road, upon the extent, terms, and conditions upon which the same may be appropriated or used and occupied by such corporation, and if such parties shall be unable to agree thereon,

such corporation may appropriate so much thereof as may be necessary and convenient in the location and construction of said road."

Section 5, being Rem. & Bal. Code, § 5718, provides:

"Whenever a private corporation is authorized to appropriate any public highway or grounds, as mentioned in the last section, if the same be within the limits of any town, whether incorporated or not, such corporation shall locate their road upon such particular road, street, or alley, or public grounds within such town, as the local authorities mentioned in the last section and having charge thereof shall designate; but if such local authorities shall fail or refuse to make such designation within a reasonable time when requested, such corporation may make such appropriation without reference thereto."

Section 6, being Rem. & Bal. Code, § 5719, provides:

"Whenever such public highway or grounds are taken by a private corporation by agreement with the local authorities mentioned in the last preceding section, such corporation may place such gates thereon and charge and receive such tolls thereat as such local authorities may consent to by such agreement, and none other; but when the same is appropriated without such agreement, as provided in said section such corporation shall not place any gate or other obstruction upon the public highway or grounds appropriated, nor charge or receive any toll from any person passing over or along the same."

This last section is not quoted or relied upon by counsel for the railway company as all the others are, but as we proceed we think it will be found to lend material aid to a proper construction of the other sections. The Laws of 1869 are referred to by the compilers of Rem. & Bal. Code as the first enactment of this law, but it will be found re-enacted with some change in 1873, as we have cited.

It is contended by learned counsel for the railway company, in substance, that the term "land" as used in §§ 1 and 2, as descriptive of the property subject to appropriation, includes land already devoted to a public use, as a state or

county road; that the demands of railway companies for rights of way are by this law deemed superior to the necessities of such highways; that such highways may be so appropriated with or without the consent of the county authorities; and that by virtue of § 5, the same right of appropriation is given as to streets in cities and towns. In *Seattle & M. R. Co. v. State*, 7 Wash. 150, 34 Pac. 551, 38 Am. St. 866, 22 L. R. A. 217, it was sought to condemn a right of way for the railway over tide lands belonging to the state. The right to do so was based upon §§ 1 and 2 of this act, there referred to as §§ 1569 and 1570 of Hill's Code. Disposing of this contention, the court said:

"The state appeared by the attorney general, and moved to dismiss the proceeding as against it, on the ground that the court had no jurisdiction to entertain it, which motion was denied. We think the court erred in its ruling on this point, for the following reasons: The state is the owner of this land, and there is no authority, either express or implied, in the statutes for the taking of any part of it through exercise of the power of eminent domain. Our eminent domain act, as applied to railroads (Gen. Stat., §§ 1569-70; Code Proc., title 9, chap. 5), must be construed, as are all such acts, as having regard only to the taking of private property, unless there is either express or clearly implied authority to extend them further. Lewis, Em. Dom., § 273; *State v. Anthoine*, 40 Me. 435; *Marblehead v. Commissioners*, 5 Gray, 451; *Charlestown v. Commissioners*, 3 Metc. 202; *Stevens v. Erie Ry. Co.*, 21 N. J. Eq. 259."

At that time this law did not in terms enable the acquisition of a railway right of way over state lands as the amendments since then do, by specifically naming "lands granted to the state for university, school or other purposes, and also tide and shore lands belonging to the state." Rem. & Bal. Code, § 8740. No amendments, however, have been made which in any manner enlarge the power given in this law to acquire the right by a public service corporation to occupy public highways. It would seem that, if the word "land," as descriptive of property which might be so ac-

quired by a railway company, did not then mean tide land which the state held with the power of sale, practically as a private owner, it could hardly mean land held by the state in trust for the public as a public highway. This would seem to dispose of the railway company's contentions, in so far as its attempted acquisition of the use of this avenue in this exclusive manner may be regarded as being based upon the right of eminent domain as against the public. That decision has since then been cited with approval by this court in the following cases: *North River Boom Co. v. Smith*, 15 Wash. 138, 45 Pac. 750; *Samish Boom Co. v. Callvert*, 27 Wash. 611, 68 Pac. 367; *State ex rel. Trimble v. Superior Court*, 31 Wash. 445, 72 Pac. 89, 66 L. R. A. 897; *State ex rel. Attorney General v. Superior Court*, 36 Wash. 381, 78 Pac. 1011. Just what right the railway company may have under the proviso of § 2 to the use of state or county roads, we need not now determine, since that proviso relates only to the occupancy of such roads. We are not able to see that it has anything to do with city streets.

Let us now turn to the rights claimed by the railway company under §§ 4, 5, and 6. The right of public service corporations to occupy streets under these sections, if such right exists at this time by consent of the council, is more in the nature of a franchise right than a right of eminent domain. It is a franchise right to be granted by the local authorities, or, if exercised without their consent, may be considered as a franchise granted direct by the state, but without the right to collect toll on the part of the public service corporation exercising such right. We are not concerned here with the right of any public service corporation save that of a railway company. The fact that a public service corporation organized for the purpose of maintaining a "macadamized road," "plank road" or "clay road," as named in § 1, may, under this law, have the right to "appropriate" a portion of a street, does not necessarily mean that

a railway company has any such right. Nor does it necessarily mean that even such road corporation can occupy a part of a public road or street to the exclusion of the public therefrom, notwithstanding the word "appropriate" is used to designate such occupancy. Now, it will be noticed that § 4 refers only to "any road herein mentioned." This means, of course, any road operated by some public service corporation which may appropriate some part of a public road outside the limits of a municipal corporation, with or without the consent of the county court. Section 5 purports to give the same right to the same corporations to appropriate parts of streets "within the limits of any town." If we proceeded no farther, it might well be argued that the word "road" used in these two sections does not include "railway" or "railroad." But when we proceed to § 6, a part of the same law, it seems to us that it becomes clear that this use of the streets was not intended to be given to railway companies in towns. Section 6 refers to the use which may be made of the parts of public roads and streets appropriated by corporations, and so limits that use as to render it clear that none but toll road companies were to have such right of appropriation under §§ 4 and 5. It is hardly conceivable that the provision relating to the maintaining of gates and charging toll has any reference to a railway corporation's use of roads or streets, yet such provisions would apply to railway corporations if such corporations are given rights of appropriation, by virtue of §§4 and 5. It is worthy of note in this connection that the word "railway," not "railroad," is used in §§ 1 and 2, while the word "road" is used in connection with "macadamized" "plank" and "clay," and in § 4, it is "any road herein mentioned" that may occupy a portion of a public highway.

It is insisted that the use of the word "appropriate" indicates an intention to allow the appropriation of public roads and streets to the entire exclusion of their use by the public as such, if desired by the corporation seeking their use, and

hence must apply to railways as well as to other corporations. This contention, however, cannot prevail, in view of the limitations in § 6 touching the manner of use by the appropriating corporation, though the word "appropriate" may ordinarily have a somewhat broader meaning. In view of the fact that this law in terms refers only to public highways outside "the corporate limits of a municipal corporation" and those "within the limits of any town," it might be argued that in no event could it apply to streets in a city of the first class. No such municipal corporation as our cities of the first class, either in size or organization, existed in the territory at the time of the original passage of this law in 1873, and §§ 4, 5, and 6, which we have been discussing, have not been amended since then. However, since counsel have made no contention upon this ground, we express no opinion as to possibility of the law being applicable to the public streets of such cities. Nor is it at all likely that there will ever be occasion to attempt the exercise of any such right by a toll road corporation in such a city. We are of the opinion that a railway company cannot acquire under this law any right to occupy any portion of a public street in a city of the first class, either with or without the consent of the legislative authority of such city. The authorities hereafter cited in support of our conclusions upon the railway company's claims under other statutes lend support to this view.

We now turn to the second class of legislation relied upon by learned counsel for the railway company. These statutes have to do with the powers of cities of the first class and the powers of their councils. This expression, suggesting a difference in these powers, we use advisedly. We will have occasion to notice this difference as we proceed. Many provisions of the statutes conferring powers upon such cities and their councils have been called to our attention, but we think the following are all that can possibly lend any support to the claims of the railway company. In 1890 the legislature

passed an act to provide for the government of cities having a population of twenty thousand or more inhabitants, enabling such cities to frame charters for their own government. The purpose of this act was to give effect to § 10, article 11, of the constitution. The powers given by this act were conferred upon the people of the cities rather than upon their councils or officers. It has been appropriately referred to by the courts and the bar as the "enabling act." Section 5 of this act, being Rem. & Bal. Code, § 7507, provides:

"Any such city shall have power . . .

"(7)   To lay out, establish, open, alter, widen, extend, grade, pave, plank, establish grades, or otherwise improve streets, . . . and to regulate and control the use thereof, and to vacate the same. . . .

"(8)   To change the grade of any street, highway or alley within its corporate limits, and to provide for the payment of damages to any abutting owner or owners, . . .

"(9)   To authorize or prohibit the locating and constructing of any railroad or street railroad in any street, alley, or public place in such city, and to prescribe the terms and conditions upon which any such railroad or street railroad shall be located or constructed; to provide for the alteration, change of grade, or removal thereof . . ."

Cities of twenty thousand or more inhabitants are by statute designated as cities of the first class. Rem. & Bal. Code, § 7479. So this act is applicable to Spokane. In 1907 the legislature passed an act as follows:

"An Act granting additional authority to cities of the first class to authorize the location, construction and operation of railroads in, along, over or across any highway, street, alley, or public place, and to prescribe the duration and condition of such use, notwithstanding any charter provisions limiting the term of franchise, or concerning the acquisition by any such city of the property of companies holding any franchise, privilege, license, grant or authority, and declaring an emergency.

"Be it enacted by the Legislature of the State of Washington:

"Section 1.   Any city of the first class shall have the power

by ordinance to authorize the location, construction and oper-
ation of railroads in, along, over and across any highway,
street, alley or public place in such city, for such term of
years and upon such conditions as the city council of such
city may by ordinance prescribe,. notwithstanding any pro-
visions of the charter of such city limiting the terms of fran-
chises, or requiring such franchises to contain a provision
that such city shall at any time have the right to appropri-
ate, by purchase, the property of the corporation receiving
any franchise, license, privilege or authority: Provided, how-
ever, That nothing herein contained shall be construed as ap-
plying to street railroads or railroads operated in connection
with street railroads, in and along the streets of such city."
Laws of 1907, p. 57; Rem. & Bal. Code, § 7510.

It is strenuously argued that these statutes confer upon
the city council the power to grant to the railway company
the exclusive use of a portion of this avenue in the manner
contemplated by this ordinance.  If this power is vested in
the council, then by the mere passage of an ordinance to that
effect, any street in any city of the first class can be surren-
dered wholly to any railway company to the entire exclusion
of ordinary highway travel, and its use as a public highway
thus be absolutely destroyed.  The most important metro-
politan thoroughfare in the state would have to yield its life
as a public street to this power if the city council sought to
exercise it.  Of course, it is conceded that the power could be
made effective only upon rendering compensation to owners
of abutting property.  This, however, only touches the pri-
vate rights involved.  Before the question of compensation
for the interference with such rights can be made the subject
of inquiry in an eminent domain proceeding, it must clearly
be made to appear that the power can be exercised *against
the right of the public to use the street as a public highway.*
The fact that only half of this avenue is here sought to be
devoted to a purpose which prevents the use of that portion
as a street is of no consequence in this inquiry, for this is a
question of power, and the power which can thus take such
portion can take all.  These observations, we concede, do

not show a legal reason for saying the legislature has not granted to the city council this power; but they do suggest that only by clear and unmistakable language of legislative enactment will we be warranted in holding that such power exists in the council.

It will be well to here notice that this is not a vacation ordinance. It is not seriously so contended and could not be. It is true that in subdivision 7 of § 7507, above quoted, the power to vacate appears to have been given, but that power must now be exercised as provided by Laws of 1901, p. 175 (Rem. & Bal. Code, §§ 7840-7843), and it is not pretended that this law has been complied with in the passage of this ordinance. It is evident that the power here sought to be exercised is a franchise power, and is not a vacation power. What then are the rights of the public in this avenue as against the exercise of such a power? Let us notice some elementary principles touching this right of the public. In Elliott, Roads and Streets (2d ed.), § 645, the learned authors say:

" 'Public highways belong, from side to side and end to end, to the public,' and any permanent structure or purpresture which materially encroaches upon a public street and impedes travel is a nuisance *per se*, and may be abated, notwithstanding space is left for the passage of the public. This is the only safe rule, for, if one person can permanently use a highway for his own private purposes, so may all, and if it were left to the jury to determine in every case how far such an obstruction might encroach upon the way without being a nuisance, there would be no certainty in the law, and what was at first a matter of small consequence would soon become a burden not only to adjoining owners, but to all the tax-payers and the traveling public as well. Thus expediency forbids any other rule. But even if it did not, the rule is well founded in principle, for it is well settled that 'the public are entitled, not only to a free passage along the highway, but to a free passage along any portion of it not in the actual use of some other traveler,' and if this be true it necessarily follows that there can be no rightful permanent use of the way for private purposes."

In 2 Dillon's Municipal Corporations (4th ed.), § 660, that: learned commentator says:

"The king cannot license the erection or commission of a. nuisance; nor in this country can a municipal corporation do . so by virtue of any implied or general powers. A building,. or other structure of a like nature, erected upon a street without the sanction of the legislature, is a nuisance, and the- local corporate authorities of a place cannot give a valid per- mission thus to occupy streets without express power to this. end conferred upon them by charter or statute."

Commenting upon the nature of this right of the public to· have the use of the whole of the street for highway purposes, the supreme court of Illinois in *Smith v. McDowell ex rel.. Hall*, 148 Ill. 51, 68, 35 N. E. 141, 22 L. R. A. 393, speak- ing through Justice Shope, said:

"The permanent encroachment upon a public highway or· street unauthorized by the legislature, and the creation of a purpresture therein, which obstructs the free and uninter- rupted passage of the public, is, as a matter of law, a public· nuisance. The matter of inconvenience to the public, or that sufficient of the street may remain unobstructed to still ac- commodate the public travel, cannot be considered. The-· trustee of the public,—the municipality,— is charged with the duty of keeping and maintaining the streets, in all their· parts, open and unobstructed, and in reasonably safe condi- tion for the public use. No question of the amount of dam-· age done or that may ensue from the creation of the pur- presture is raised, nor can it be considered in proceedings by· the public, the question being, simply, whether there has. been an invasion of the public right."

A vast array of authorities could be cited in support of⁻ this doctrine. It has become elementary. This being the nature and extent of the right of the public to use this ave-· nue, we recur to the question, Has that right been lawfully· surrendered to the railway company by this ordinance? An instructive opinion bearing upon this question was rendered⁻ by the court of appeals of New York in *Delaware, L. & W. R. Co. v. Buffalo*, 158 N. Y. 266, 53 N. E. 44. It there ap-⁻

pears that the city council had granted permission to the railroad company to construct an overhead crossing over a street of the city. Accordingly the crossing was constructed, resting upon permanent piers placed in and occupying about one-half the width of the street. Thereafter a controversy arose between the railroad company and the city as to the right of the company to maintain the piers in the street. The court construed the terms of the grant by the council as not including the right to so maintain the piers, which was one of the questions involved, but also placed its holding against the railroad company upon the broader ground of want of power in the council to grant such permission, saying:

"It is true that railroad companies are authorized to construct their roads across, along, or upon any street or highway in a city with the assent of the municipal authorities. That is simply a general authority to cross streets with the consent of the local authorities. When a railroad company relies upon a legislative act as a justification for an encroachment upon public or private rights, or, as in this case, as a justification for the occupation with its piers and abutments of a public highway, it must show that the statute authorized in express terms or by clear and unquestionable implication the doing of the very acts complained of, or that the statute was imperative, and could not be executed without causing a nuisance. The plaintiff had general legislative authority to cross the street in question, but it had no express authority to occupy a large portion of the public highway with abutments and piers for the support of its structure, to the great inconvenience and detriment of the public. Nothing less than express authority to place these obstructions in the street will shelter the plaintiff from the consequences of creating a nuisance by the obstruction of a public highway."

In *Lake Shore & M. S. R. Co. v. Elyria*, 69 Ohio St. 414, 69 N. E. 738, the supreme court of Ohio dealt with a similar situation. The statute relied upon as conferring power upon the council to grant such occupancy of the street, among other things, provided:

" 'If it be necessary, in the location of any part of a railroad, to occupy any public road, street, alley, way, or ground of any kind, or any part thereof, the municipal or other corporation, or public officers or authorities, owning or having charge thereof, and the company, may agree upon the manner, terms, and conditions upon which the same may be used or occupied; and if the parties be unable to agree thereon, and it be necessary, in the judgment of the directors of such company, to use or occupy such road, street, alley, way, or ground, such company may appropriate so much of the same as may be necessary for the purposes of its road, in the manner and upon the same terms as is provided, for the appropriation of the property of individuals.  .  .  .' "

Referring to this provision, the court said:

"Does it authorize the council to grant to a railway company the *exclusive* and permanent right to occupy a public street or part of it at a crossing or elsewhere?  Or does it merely authorize a joint occupancy?  We have no doubt that the General Assembly, representing the sovereignty of the state, may empower municipal councils to make the larger grant and confer the exclusive use, but has it done so by the foregoing legislation?  We think not.  To establish, lay out, and open up a county road or a public street, the statutes have made clear and distinct provisions, and, when the road or street is no longer of public use or utility, provisions equally clear and distinct are made for their vacation, of all which public records are made, and we find nowhere any other method of vacating such public highway or any part of it. By the proper establishment and opening of the street, the village or city becomes vested with the full title thereto, in trust for the public, and it is not within the delegated powers of the municipal council to barter or grant away such title except in the mode provided for the purpose.  In the liberality of our laws, and in proper recognition of the necessities and benefits of railroad enterprises, a joint use is permitted, and the railway company, in a manner, and upon such terms and conditions as it and the council may agree, may occupy a road, street, alley, way, etc.  But its occupancy must not extinguish the prior title and use, and permanently exclude the public.  It cannot destroy the dominant right of the public.  To authorize the council, the municipal authorities,

to grant more than a joint occupancy, requires clear and express language in the statute to that effect, and which we do, not find in the section."

A great many decisions of the courts could be cited in support of these views. Among others we note the following: City of St. Paul v. Chicago M. & St. P. R. Co., 63 Minn.. 330, 63 N. W. 267, 65 N. W. 649, 68 N. W. 458, 34 L. R. A. 184; Chicago, R. I. & P. R. Co. v. People, 222 Ill. 427, 78. N. E. 790; Ligare v. Chicago, 139 Ill. 46, 28 N. E. 934, 32 Am. St. 179; Lockwood v. Wabash R. Co., 122 Mo. 86, 26 S.. W. 698, 43 Am. St. 547, 24 L. R. A. 516; State v. Mayor of Jersey City (N. J.), 18 Atl. 586; Warren R. Co. v. State,. 29 N. J. L. 353; Barney v. Keokuk, 94 U. S. 324, 342. This. court recognized the soundness of these views in State ex rel. Spokane & British Columbia Telephone & Telegraph Co. v.. Spokane, 24 Wash. 53, 63 Pac. 1116, though the question was not there directly involved. At page 59 it is said:

"The primary purpose for which highways and streets are· established and maintained is for the convenience of public-travel. The use of such highways and streets for water mains, gas pipes, telephone and telegraph lines is secondary and subordinate to the primary use for travel, and such secondary use is permissible only when not inconsistent with the primary object of the establishment of such ways."

Of course, the use of a street for a railway is secondary and subordinate to the primary use it is intended for, the· same as the uses mentioned by the court in that case were· secondary to such primary use.

We will not attempt to follow learned counsel for the railway company through the details of their voluminous and elaborate brief. We believe the application of the principles of law shown to exist by the authorities we have reviewed and. cited are sufficient to demonstrate that the power is not given to the city council by the statutes relied upon to grant to the· railway company the exclusive use of a portion of Front avenue as contemplated by this ordinance. We will, however,.

notice some other matters to which counsel have particularly directed our attention.

It is insisted that since by the title of the act of 1907 Rem. & Bal. Code, § 7510, it purports to be an act granting "additional authority" to cities of the first class, it was evidently intended thereby to give to such cities greater power than they already possessed. It is pointed out that the enabling act of 1890 (Rem. & Bal. Code, § 7507), gives the power to the cities to authorize the location and construction of railroads in streets; from which it is argued that the passage of the 1907 act would be to no purpose unless it be held to give the city some additional power. This supposed additional power, it is contended, consists of power to grant to railway companies some greater rights in their occupancy of the streets than could be granted under the power of the city possessed by virtue of the enabling act of 1890. There appears no basis for this contention other than the mere fact of the words "additional authority" being found in the title of the later act. When we turn to the body of the act we find the grant of power given by rather more words than in the act of 1890, but we are not able to see that it is any more comprehensive. The only difference in the words indicating what privilege may be granted by the council is that by the act of 1890 there may be granted the right to locate and construct a railroad "in any street"; while by the act of 1907 there may be granted the right to locate and construct a railroad "in, along, over and across any highway." It is in these additional words, in connection with the title of the act of 1907, that counsel seem to see greater power conferred upon the city than in the grant of power in the enabling act of 1890.

Now, it seems to us that there is a fundamental difference in the two grants of power that, when recognized, will at once render plain the purpose of the enactment of the latter. The act of 1890 was passed before there were any cities with freehold charters, as such charters are commonly called; that

is, charters framed by the people of the cities. That act did
not grant power to the councils of such cities or to any of
the officers of such cities. It granted power to the cities..
This power was left to the cities to be exercised in such man--
ner as the people thereof might provide by their charter.
They were free to put upon their councils such limitations.
as they deemed wise, so far as that act is concerned. Indeed,.
it is not difficult to see that the council might, by the pro-
visions of a charter adopted by the people, be entirely pro--
hibited from exercising any power to grant railroad privi-
leges in the streets, so far as that act is concerned. We take
judicial notice of the fact that, in at least some of these cities,.
the power of the council was very much limited in the exer-
cise of this power. It was only by a general law, such as this.
act of 1907, that such charter restrictions could be removed.
In the body of this act of 1907 we find that this franchise-
power is granted to cities of the first class to be exercised "by
ordinance." This, of course, means by the city council, and'
as the act provides, "notwithstanding any provisions of the-
charter of such city limiting the terms of franchises." Here,.
then, we have an additional power granted, not to the city in-
the sense in which the power was granted by the enabling act
of 1890, but to the city council—a power which the council'
would not necessarily possess without restriction under the-
city charter—a power which, indeed, the council might not
possess at all under the city charter. It is evident that this.
power is additional only in this sense, unless it can be said'
it is additional because of the use of the words "in, along,.
over, and across," instead of the word "in" standing alone-
as it does in the enabling act of 1890.

Some contention is made that the word "in" must be pre-
sumed to have been used to express something not expressed'
by the words "along, over, and across." It is suggested that.
the word "in" appropriately describes the construction of a
railway as this is proposed to be constructed. If rules of-
legal construction, as counsel insist, require us to look for a.

meaning for this word not covered by the others, it could as well be suggested that it means in the street low enough to admit of preserving the surface so as not to interfere with the use of the street by the public, as to attribute to the word the meaning suggested by counsel. No authorities have been called to our attention indicating that the word "in," as here used for the purpose of describing the nature and extent of a power to grant a railway franchise in a street, has ever been held to mean that any part of the surface of a street could be entirely taken from public use as a highway by virtue of such power. The following authorities, cited by counsel, are in point upon questions similar in their nature to this, but do not militate against the soundness of our conclusions. *State v. Newport St. R. Co.*, 16 R. I. 533, 18 Atl. 161; *Cook County v. Great Western R. Co.*, 119 Ill. 218, 10 N. E. 564; *New York L. & W. R. Co. v. Roll*, 32 Misc. Rep. 321, 66 N. Y. Supp. 748; *Re People's Rapid Transit Co.*, 125 N. Y. 93, 26 N. E. 25, 10 L. R. A. 728.

Counsel for the railway company make some contentions based upon provisions of these laws giving power to the city to alter streets, to change the grade of streets, and other provisions evidencing the city's general control over streets. We will not follow counsel through these contentions, deeming it sufficient to say that, in our opinion, none of these provisions indicate any grant of power to surrender the use of streets or any part of the surface thereof to any purpose, using the language of this court in *State ex rel. Spokane & British Columbia Telephone & Telegraph Co. v. Spokane, supra,* "inconsistent with the primary object of the establishment of such ways," that is, inconsistent with their use as public highways.

It is suggested that this inclosed part of the surface of the avenue is to be used in such a manner as to enable the railway to descend to a grade sufficiently low to not interfere with the surface of the avenue along other portions thereof, and that since the power to grant the use of the avenue under the sur-

face is given, the surface may be used for the purpose of reaching such grade under the surface. · This argument might have some weight if there were no other ways of reaching a proper grade under the surface of streets. But manifestly it is as easy to pass from private property under a street surface as it is to pass from private property to the surface of the street. We think this lends no support to counsel's contentions.

It seems to us that a railway company given the use of a public street, under the powers of the city council here invoked, must be given that use, if it is to occupy any of the surface of the street, upon substantially the same terms as any other traveler upon such street may use it; that is, a free passage along the portion of the street surface so granted, when it is not in the actual use of some other traveler. Such railway company may have some superior rights under, and some exemptions from the requirements of, the law of the road, because of the fact that its trains cannot turn from off . its tracks; but it cannot acquire by any grant from the city council, without plain legislative authority therefor, any greater right to permanently occupy any portion of the street surface so as to obstruct public travel thereon than any other person or traveler can acquire. We are of the opinion that the city council of the city of Spokane does not have the power to grant to the railway company the right to occupy Front avenue in front of relator's property in the exclusive manner contemplated by this ordinance. It follows that the railway company does not possess the power to condemn the property rights of the relator sought to be acquired in the condemnation proceeding. The findings of necessity and order of trial to assess damage, made in that proceeding against the relator, are reversed and set aside.

Rudkin, Fullerton, and Gose, JJ., concur.