[No. 9371. Department Two. August 19, 1911.]

THE STATE OF WASHINGTON, *on the Relation of Norbert R. Sylvester et al., Plaintiff,* v. THE SUPERIOR COURT FOR BENTON COUNTY, *Respondent.*[1]

MUNICIPAL CORPORATIONS—USE OF STREETS—FRANCHISE—TO RAILROADS—POWER TO GRANT. A city may grant a franchise to a railroad company to occupy a portion of a city street where the same does not exclude the public therefrom; and a franchise prohibiting an exclusive use at present or at any time in the future is valid.

EMINENT DOMAIN — USE OF STREETS — EXTENT — PROCEEDINGS — FRANCHISE. The nature of a railroad's occupancy of a city street is not to be determined by its petition to condemn against the abutter, nor by the order of necessity, but by the terms of the franchise.

MUNICIPAL CORPORATIONS—USE OF STREETS—FRANCHISE—TO RAILROADS. Authority to grant to a railroad company a franchise to lay tracks lengthwise in a street is conferred by Rem. & Bal. Code, § 7731, subd. 13, authorizing permits to lay railroad tracks and run cars drawn by horses, steam, or other power thereon.

EMINENT DOMAIN—PROPERTY SUBJECT—STREETS. A railroad company may condemn a right to lay tracks in a street as against the rights of abutting owners, if it has a lawful franchise to use the street.

EMINENT DOMAIN—LOCATION—CHANGE. A railroad company may make a change in its location in order to correct an error in engineering, where it was found that high water in a river did not admit of a grade line upon the route as surveyed and adopted; both at common law and by virtue of Rem. & Bal. Code, § 8738 providing for such changes.

EMINENT DOMAIN—LOCATION—NECESSITY. The selection by a railroad of a route for a change in its location necessitated by an engineering error makes a *prima facie* case of necessity, which is conclusive in the absence of evidence of a more suitable and less injurious route; and the selection of a street does not show an abuse of power.

MUNICIPAL CORPORATIONS—ORGANIZATION—CHANGE IN CLASSIFICATION—OFFICERS—ORDINANCES. After a town of the first class is raised to a city of the third class, the councilmen of the old cor-

[1]Reported in 117 Pac. 487.

poration continue to act and have power to pass ordinances until the organization of the new corporation by the election and qualification of new officers at the next general election, pursuant to the provisions of Rem. & Bal. Code, § 7488, providing that it shall be a city of such class upon certification to the secretary of state and that notice thereof shall be taken when the corporation is actually organized by the election and qualification of its officers, and Id., § 7489, providing that the old officers shall act until the next annual municipal election and officers of the new corporation are elected and qualified.

MUNICIPAL CORPORATIONS—ORDINANCES—DEFECTS—COLLATERAL ATTACK. Reference in a franchise ordinance of the "town" of K., to "city" of K., signed and sealed by the clerk of the "city" of K., are mere informalities that do not affect the validity of the franchise, when attacked by private persons or in collateral proceedings.

Certiorari to review an order of the superior court for Benton county, Frater, J., entered January 23, 1911, adjudging a public use and necessity in proceedings to condemn property for railway purposes. Affirmed.

*Moulton & Henderson*, for relators.

*Danson & Williams* (*George D. Lantz*, of counsel), for respondent.

ELLIS, J.—The relators, by certiorari, seek a review of findings of public use and necessity made by the respondent court in eminent domain proceedings instituted by the Oregon-Washington Railroad & Navigation Company to condemn the property rights of relators as owners of lots abutting upon Front street, in the city of Kennewick. Relators' lots abut upon the southerly side of the street, with a frontage thereon of about seventy-five feet. The railroad company proposes to construct, on the north thirty feet of the street, a double track railway as a part of its main line. Prior to the institution of the proceedings, the town of Kennewick, by ordinance, the validity of which is questioned, granted to the company a franchise to build and operate its road on the street. On April 24, 1908, prior to the date of this franchise, the North Coast Railroad Company, grantor of the Oregon-

Washington Railroad & Navigation Company, adopted a different line through the city, and condemned a portion of its right of way thereon. The Oregon-Washington Railroad & Navigation Company is still occupying a part of this prior location with its tracks.

The relators first contend that the railroad company, under the laws of this state, could acquire no right to occupy any portion of the street, either with or without the consent of the city council. This, aside from the question of statutory authority, must depend upon the nature of the proposed occupancy. In *State ex rel. Schade Brewing Co. v. Superior Court*, 62 Wash. 96, 113 Pac. 576, we held that the city of Spokane had no power to grant to a railway company the right to occupy any part of the street to the entire exclusion of the public, and in effect that the grant of a franchise purporting so to do was *ultra vires*. In that case the franchise purported to authorize the railway company to make a cut in the street thirty-two feet wide and support its sides with walls of masonry, with a substantial iron fence on top of the walls effectually excluding the public from the portion of the street so occupied. It is claimed that case is decisive of the question here, because the petition for condemnation alleges that "It is necessary and required by said petitioner for it to appropriate and use all of said north thirty feet of Front street," and because the order of necessity is couched in similar terms. But the nature of the occupancy proposed is determined neither by the petition to condemn against the abutter nor by the order of necessity. It must be determined by the terms of the franchise.

In *State ex rel. Sylvester v. Superior Court*, 60 Wash. 279, 111 Pac. 19, we held that the right to condemn against the abutter is dependent upon the right to occupy the street as against the public. As a corollary the grant from the public is the measure of the occupancy proposed in the condemnation. The franchise here in question does not authorize an exclusive occupancy. It provides that the tracks shall con-

form in every respect to the established grade of the street; that trains shall not be permitted to stand between Washington and Seventh streets for a longer period than five minutes; that the tracks shall not be used for the storage of cars; that the company shall not block crossings for longer than five minutes at a time; that the tracks shall be used for no other purpose than as a main line for the passing of trains; that all telegraph and telephone wires used by the grantee shall be placed underground; that the crossing at Pacific street shall never be blocked by standing trains except in cases of unavoidable emergency, and then no longer than absolutely necessary; that the grantee shall not impede ordinary traffic or subject the public to unnecessary danger or inconvenience resulting from constructing, operating, or maintaining the tracks. The franchise thus not only prohibits a present exclusive use, but guards against the use ever becoming exclusive. The contrast with the case of *State ex rel. Schade Brewing Co. v. Superior Court, supra,* is plain.

It is further urged that the council of Kennewick had no statutory authority to grant a franchise to lay tracks lengthwise on the streets, and that before such a franchise could be granted, such power must be conferred by statute in express terms or by necessary implication. But in this state the statute defining the powers of the council of fourth class cities or towns expressly confers that authority. Rem. & Bal. Code, § 7731, subd. 13, is as follows:

"(13)   To permit, under such restrictions as they may deem proper, the laying of railroad track and the running of cars drawn by horses, steam, electricity or other power thereon; and the laying of gas and water pipes in the public streets; and to construct and maintain, and to permit the construction and maintenance of telegraph, telephone and electric light lines therein."

The semicolon found after the word "thereon" in the above provision was plainly used by inadvertence instead of a comma. Practically the same provision is found with refer-

ence to third class cities, but a comma there appears instead of the semicolon. Rem. & Bal. Code, § 7685, subd. 13. Counsel contends that this is no more than authority to grant to the railroad company the right to construct and operate its lines within the city limits and across streets where necessary. This is not warranted by the context. It will hardly be contended that the right to lay tracks lengthwise on the streets for cars drawn by horses or electricity may not, under this statute, be authorized by the council, yet the power is no more explicit as to tracks for cars so drawn than as to tracks for cars drawn by steam or other power. The power is conferred by the same words. To read into the statute the word "across" is to legislate, not to construe. Authorities are cited in this connection relating to the exercise of the power of eminent domain as against municipalities for the taking of public grounds for another public use, and to other questions touching the power of eminent domain. They are foreign to the matter here involved, and no useful purpose would be served by reviewing them.

The primary question here is as to the right to grant the franchise, not as to the right to exercise the power of eminent domain. It must be conceded that the right to condemn as against the relators exists if the power to grant the franchise existed and was properly exercised by the city. *Lund v. Idaho & Washington N. R.*, 50 Wash. 574, 97 Pac. 665.

It is next contended that, by the prior and different location of April 24, 1908, the railroad company had exhausted its power of eminent domain, and could not make a change of location without statutory authority. It is unquestionably the law that a general or unnecessary change cannot be made without such authority. The general rule is as quoted by counsel from 1 Lewis on Eminent Domain (3d ed.), § 402, which, after stating that the power to locate a general route is usually given to the corporation either by charter or general statute, continues:

"When the choice or discretion which is thus given has been

exercised, the power is exhausted, and the location cannot be changed, in the absence of a statutory provision permitting such changes to be made. 'The general rule is,' says the court in one case, 'that where the *termini* and general route of a railroad are prescribed by the charter, leaving the determination of details to the discretion of the corporation, the power of the company to fix the location of the road is exhausted after such discretion has been exercised, and it cannot relocate its road without statutory authority to do so, and being without power to relocate its road the company is without power to condemn a right of way for a line which it cannot lawfully locate.' "

But the author adds:

"But this principle is not to be applied too rigidly. A general or material change of location cannot be made. But minor changes can be made, which experience or change of circumstances have demonstrated to be necessary or desirable. The growth of a town in a certain direction may make a former location of a depot very inconvenient. A railroad may be destroyed by a mountain slide or a washout in such a way that reconstruction would be impracticable or impossible. In such cases it seems to us a change of location may be made so as to obviate the inconvenience in the one case or the difficulty in the other. And so are the authorities."

33 Cyc. 131, after stating the general rule, also adds:

"But that such changes may be made as are necessary to correct errors in engineering or to avoid obstacles which would defeat or interfere with a proper construction of the road, the railroad company being liable for the damages already actually sustained by landowners by reason of the prior location."

See, also, *Hagner v. Pennsylvania S. V. R. Co.*, 154 Pa. St. 475, 25 Atl. 1082; *Collier v. Union R. Co.*, 173 Tenn. 96, 83 S. W. 155; *Whalen v. Baltimore & O. R. Co.*, 108 Md. 11, 69 Atl. 390, 129 Am. St. 423, 17 L. R. A. (N. S.) 130; *Ligat v. Commonwealth*, 19 Pa. St. 456.

The chief engineer of the company testified that the change of location was made because:

"It was found that the high water of the Columbia river

would not admit of a grade line upon their location as surveyed and adopted, without exposing the railroad company to the high water of the Columbia river. For that reason the location upon the north side of the Northern Pacific right of way, as a main line extending towards Walla Walla, was impracticable."

We think that the situation here described is sufficient to invoke the exception to the general rule recognized by the above authorities. But in any event, statutory authority is not wanting in this state. Rem. & Bal. Code, § 8738, reads as follows:

"Any corporation may change the grade or location of its road or canal, not departing from the general route specified in the articles of incorporation, for the purposes of avoiding annoyances to public travel, or dangerous or deficient curves or grades, or unsafe or unsubstantial grounds or foundation, or for other like reasonable causes, and for the accomplishment of such change shall have the same right to enter upon, examine, survey, and appropriate the necessary lands and materials as in the original location and construction of such road or canal."

This section was originally § 3 of chapter 3 of the act of 1873, Laws of 1873, p. 412. Counsel cite *State ex rel. Schade Brewing Co. v. Superior Court*, 62 Wash. 96, 113 Pac. 576, as authority that this section does not apply to railroad corporations. In that case it is questioned whether the word "road," used in §§ 4, 5, and 6 of the chapter, has any reference to the railroad or railway corporations referred to in §§ 1 and 2 of the chapter. This court, however, did not construe § 3 in any manner. Sections 1 and 2, found in Rem. & Bal. Code, as §§ 8739 and 8740, provide that a corporation organized for the construction of any railroad, macadamized road, plank road, clay road, etc. may condemn land. The word "railway" is used in the codification (Rem. & Bal. Code, § 8739); the word "railroad" in the original act (Laws 1873, p. 411). It will be observed that the section above quoted though using the word "road" begins with the words "any

corporation," thus indicating a clear intention to apply this section to any of the corporations designated in §§ 1 and 2 immediately preceding. The subject-matter of § 3 further makes this plain. It relates to change of grade or location to avoid dangers etc., and it is self-evident that this power is even more necessary in the case of railroads than in the case of the other roads mentioned in §§ 1 and 2. The same reasons do not apply to §§ 4, 5, and 6, which were construed as not including railway corporations in the *Schade* case, *supra*. We therefore conclude that the change of location, under the circumstances shown by the record, was warranted, and that the statute is but declaratory of the rule of law applicable in such cases in the absence of statute.

It is asserted that the thing here sought is not a change of, but an additional location. The evidence, however, shows the adoption of a new main line, and it is uncontradicted that the old location is being used only for construction purposes. The railroad company disclaims any intention of continuing its use as a main line.

Again, it is urged that the evidence fails to show a necessity for locating the line upon Front street. While we held in *State ex rel. Postal Telegraph-Cable Co. v. Superior Court*, *ante* p. 189, 116 Pac. 855, that the question of necessity is, under Rem. & Bal. Code, § 925, a judicial question to be determined on evidence, we also there held that the selection by the condemnor makes a *prima facie* case of necessity which can be overcome only "by clear and convincing proof that the taking of the specific land sought would be so unnecessary and unreasonable as to be oppressive and an abuse of the power." The selection by the railroad company of the location on Front street was proved. It established *prima facie* the necessity of that location. The only evidence suggested as tending to the contrary is the fact that this is a public street, and that there is private property available. This, however, is far from showing an abuse of power. It does not even tend to show that the condemnation of relators'

interest in the street is more injurious or damaging to them than would be the actual taking of their abutting lots. The evidence shows that a change of location was necessary, and it fails to show that any other than the changed location selected was more suitable for the company and less injurious to others. The necessity was sufficiently shown.

Finally, the relators contend that the franchise was void, because it was passed by an affirmative vote of only four members of the council after an election advancing Kennewick from a town of the fourth class to a city of the third class had been held. This election was held on May 24, 1910. On November 15, 1910, the ordinance granting the franchise was passed. On December 6, 1910, the first election of officers for the municipality as a city of the third class was had. Towns of the fourth class have five councilmen, and the affirmative votes of three of them are necessary to grant a franchise. Rem. & Bal. Code, §§ 7720 and 7730. Cities of the third class have seven councilmen, and the affirmative votes of five of them are necessary to grant a franchise. Rem. & Bal. Code, §§ 7672 and 7683. The law governing the advancement of towns and cities is found in Rem. & Bal. Code, §§ 7482 to 7489, both inclusive. The first six of these sections relate to procedure. The other two are as follows:

"Sec. 7488. It shall be the duty of the said board to cause a record of such action to be made, and when the clerk of said board shall make the record, he shall certify and forward to the secretary of state a transcript of the same, whereupon such corporation shall be a city of the third, second, or first class, as the case may be, to be organized and governed under the provisions of this act; and when the corporation is actually organized by the election and qualification of its officers, notice of its existence as such shall be taken in all judicial proceedings.

"Sec. 7489. The first election of officers of the new corporation shall be at the first annual municipal election after such proceedings, and the officers of the old corporation shall remain in office until the officers of the new corporation are elected and qualified; and the ordinances, by-laws, and reso-

lutions adopted by the old corporation shall, as far as consistent with the provisions of this act, continue in force until repealed by the council of the new corporation; and the council and officers of the old corporation shall, upon demand, after the expiration of their term of office, deliver to the proper officers of the new corporation all books, records, documents, and papers in their possession belonging to the old corporation."

The declaration in the section first quoted, that upon the forwarding of the transcript to the secretary of state the corporation shall be a city of the advanced class, can mean no more than that it then becomes a potential city of that class; that is, a city with power to organize as a city of the advanced class. This is shown by the last clause of the section, which provides for its recognition as such only when it is *actually organized* by the election and qualification of its officers. This is confirmed by the next section, which provides for the retention of the officers of the old corporation until officers for the new are elected and qualified. It was never intended that there should be an interval of uncertainty as to the powers and duties of officers between the election determining the advancement and the next annual municipal election actually organizing the new corporation. It is essential to orderly administration and certainty of authority that the transition from one class to the other be consummated at a fixed and definite time. Obviously that time is, and should be, when the new officers qualify. So read the authorities. In *Ritchie v. South Topeka*, 38 Kan. 368, 16 Pac. 332, practically the same question was presented. The legality of an ordinance levying a tax was questioned on the ground that no quorum of the council was present when it was passed. South Topeka was a city of the third class with five councilmen. The governor by proclamation advanced it to a city of the second class. Such cities had eight councilmen. A majority in each case constituted a quorum. After the proclamation and before the qualification of the new officers, the ordinance was passed

by a vote of four councilmen, being all who were present. The court said:

"What was the *status* of the city of South Topeka at this time? It was declared to be a city of the second class by the governor's proclamation of June 4, 1886, but its municipal government was not fully organized until some time after that date. In *Campbell v. Braden*, 31 Kan. 754, 3 Pac. 542, this court suggests that it necessarily requires time for such organization to be completed, and in this case we cannot say there was an unreasonable delay. It would not be completed until its officers, including the councilmen, were elected. The proper evidence of their election would be the canvass of the vote by the proper authorities. This was not done at the time of the levying of this tax; and therefore the city of South Topeka at that time was acting, so far as its officers were concerned, as a city of the third class. It is necessary that there should be some city government at all times, and the mere proclamation of the governor changing the form of the city from a city of the third to a city of the second class, did not leave the city without a city government; and of necessity, until the officers of the city as a city of the second class qualified as such officers, the old form of government, and the old officers, would continue. We think that the ordinance complained of was valid."

See, also, *State ex rel. Fremont etc. R. Co. v. Babcock*, 25 Neb. 709, 41 N. W. 654; *In re Assessment etc., Passaic*, 54 N. J. L. 156, 23 Atl. 517; *State ex rel. Williams v. Brooks*, 58 Wash. 648, 109 Pac. 21; 28 Cyc. 429; *Hutchinson v. Belmar*, 61 N. J. L. 443, 39 Atl. 643.

But it is claimed the ordinance must be held an ordinance of a city of the third class, because it has the appropriate enacting clause which is different from that of a town of the fourth class; because the ordinance refers to the municipality as the "city of Kennewick"; because it is sealed with the seal and attested by the clerk of the city of Kennewick; and because the acceptance and bond of the railroad company run to the city of Kennewick. All of these things are mere irregularities, since the power to grant the franchise existed and it was actually passed by the statutory vote required for

towns of the fourth class. These irregularities do not make the ordinance void. Under such circumstances the decided trend of authority sustains the franchise when attacked by private persons or in collateral proceedings.

"An ordinance passed which the corporation has no power to enact, as one levying a tax for a purpose not authorized by the charter, is an act of usurpation and all proceedings under it are void; yet where the corporation has power to pass the ordinance for a certain purpose, but exercises that power in an unauthorized manner the ordinance is valid and binding until set aside by legal proceedings instituted for that purpose, and its validity cannot be brought in question collaterally, as a matter of defense to an action under it." McQuillin, Municipal Ordinances, § 279.

See, also, *California Reduction Co. v. Sanitary Reduction Works*, 126 Fed. 29; *Truckee etc. Road Co. v. Campbell*, 44 Cal. 89; *Tennessee Coal, I. & R. Co. v. Birmingham S. R. Co.*, 128 Ala. 526, 29 South. 455; *Stedman v. Berlin*, 97 Wis. 505, 73 N. W. 57.

There being no reversible error in the record, we affirm the findings of use and necessity and order for trial.

DUNBAR, C. J., CROW, MORRIS, and CHADWICK, JJ., concur.